IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Bahia Amawi, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 1:18-CV-1091-RP |
| | § | |
| Pflugerville Independent School District; and | § | *consolidated with:* |
| Ken Paxton, in his official capacity as | § | |
| Attorney General of Texas, | § | Civil Action No. 1:18-CV-1100-RP |
| *Defendants.* | § | |

## DEFENDANT KEN PAXTON'S OMNIBUS RESPONSE TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

In 2017, the Legislature passed, and the Governor signed, a widely supported anti-discrimination law prohibiting companies who contract with the State from invidious economic boycotts of Israel. *See* TEX. GOV'T CODE § 2270.001 *et seq.* Plaintiffs in these consolidated cases ask the Court to undo that progress and facially invalidate the entire law. The Court should decline their invitation. Chapter 2270 of the Texas Government Code does not concern *personal* economic decisions or Plaintiffs' right to freely express their views on the Israeli-Palestinian conflict. Instead, it regulates *companies* that contract with the State and bars those companies from discriminating against Israel and Israeli businesses. Texas's public policy ensures that discrimination has no home within its borders, and the State can rightly deny public funds to those who would act contrary to those foundational non-discrimination principles. Plaintiffs here are sole proprietors who seek to engage in personal conduct outside of their business dealings with the State. Chapter 2270 does not restrict, or even apply to, that conduct. For these reasons and those discussed below, the pending motions for preliminary injunction should be denied.[1]

---

[1] For ease of reference, this response will refer to Plaintiff Bahia Amawi's motion for preliminary injunction as the "Amawi Br." and the motion for preliminary injunction in the *Pluecker* case as the "Pluecker Br." Unless necessary to

INTRODUCTION

## I.     Israel has faced debilitating economic boycotts since its creation.

The counter-boycott law codified in Chapter 2270 of the Texas Government Code is the Legislature's measured and targeted response to the economic warfare that has befallen Israel for over half a century.[2] The first boycotts against Israel began with the country's creation in 1948 and were aimed at the mere *existence* of the world's only Jewish state. These embargoes were institutionalized as early as 1951, in the Arab League's Central Boycott Office in Damascus. *See* Constance A. Hamilton, *Effects of the Arab League Boycott of Israel on U.S. Businesses*, U.S. Int'l Trade Commission, Pub. 2827 (Nov. 1994) at 5. In 1994, the United States International Trade Commission found that the Arab League Boycott—the prototype of the nationality-based boycott that Chapter 2270 responds to—cost Israel's economy $2 billion a year. *Id.* at vi. This decades-long commercial campaign against an isolated democracy—one of the country's, and Texas's, most trusted allies—undergirds these lawsuits.

President Carter signed the Export Administration Act of 1979 (the EAA) to counter the Arab League boycott and address the pronounced problem of foreign-state-led boycotts of Israel. *See Briggs & Stratton Corp. v. Baldridge*, 539 F. Supp. 1307, 1310 (E.D. Wis. 1982), *affirmed*, 728 F.2d 915, 916 (7th Cir. 1984). The EAA directs the "President [to] issue regulations prohibiting any United States person . . . from . . . support[ing] any boycott fostered or imposed by a foreign country against a [friendly] country [*e.g.*, Israel]." *Id.* at 1311. The EAA imposes criminal felony liability for violations, which include "[f]urnishing information about . . . hav[ing] any business relationship . . . with or in

---

distinguish the individual plaintiffs in the *Pluecker* case, this response will refer to the plaintiffs in that case collectively as the Pluecker Plaintiffs.

    [2] This unfortunate history reveals why Texas would single out Israel and Israeli businesses as vulnerable to discriminatory business practices. *Cf.* Amawi Br. at 13 (decrying "Texas's political decision to single out only government contractors for mandatory support of a single foreign country."). Virtually no other country—and certainly no other democracy—faces the widespread punishing economic boycotts that Israel has endured for decades.

the boycotted country." *See id.* The EAA survived a First Amendment challenge in *Briggs*, and does not appear to have been challenged since then.[3]

## II.     BDS boycotts target Israeli businesses.

When the EAA was enacted, the dominant Israel-boycott form was foreign-state led. Since then, a new boycott type has emerged through the Boycott, Divestment, and Sanctions (BDS) movement. The BDS movement "is a Palestinian-led movement" that seeks to force companies, institutions, and governments to end international support for Israel. *See generally*, What is BDS? https://bdsmovement.net/what-is-bds (last visited Jan. 15, 2019). It calls for the boycott of *all* Israeli products, regardless of the company's position on the Israeli-Palestinian conflict. *See* What to Boycott, https://bdsmovement.net/get-involved/what-to-boycott (last visited Jan. 15, 2019) ("The BDS movement calls for a boycott of all Israeli products."). Because BDS boycotts are not foreign-state-led, they fall outside of the EAA.

Federal policy regarding BDS boycotts makes clear that these efforts are an anathema to the United States' interest. *See* 19 U.S.C. § 4452. In particular, Congress "opposes politically motivated actions that penalize or otherwise limit commercial relations specifically with Israel, such as boycotts of, divestment from or sanctions against Israel [*i.e.*, BDS campaigns]" and explained that such boycotts "are contrary to the principle of nondiscrimination[.]" *Id.* § 4452(b)(4)–(5). Congress further directed that a "principal trade negotiating objective[] of the United States" is "[t]o discourage politically motivated boycotts of, divestment from, and sanctions against Israel[.]" *Id.* § 4452(c).

## III.    Laws like Chapter 2270 have been enacted across the country.

Twenty-five states, including Texas, have taken action to restrict the non-foreign-state-directed boycotts of Israel that are not covered by the EAA. *See* Appendix, *infra*. Texas is thus far

---

[3] The EAA was recently re-enacted by Congress in 2018 as part of the Defense Authorization Act. *See* Anti-Boycott Act of 2018, Pub. L. No. 115-232 §§ 1771-74. That Act passed 359-54 in the House and 87-10 in the Senate.

from alone among the states in its decision not to contract with businesses that discriminatorily boycott Israel. Numerous states have similarly  prohibited or limited government contracts with entities that boycott Israel. *See, e.g.*, ARK. CODE § 25-1-503; FLA. STAT. § 287.135; GA. CODE § 50-5-85; IOWA CODE § 12J.6; NEV. REV. STAT. § 333.338. "In every state legislative body that had a roll call taken, [these provisions] passed by decisive if not overwhelming margins." *See* Mark Goldfeder, *Stop Defending Discrimination: Anti- Boycott, Divestment, and Sanctions Statutes Are Fully Constitutional*, 50 TEX. TECH L. REV. 207, 213 (2018).

## IV.    Chapter 2270 targets economic, discriminatory boycotts against Israel.

In Texas, the Legislature enacted House Bill 89 in 2017 by bipartisan margins. The law passed unanimously in the House, and 26-5 in the Senate.[4] *See* H.B. 89, S.J. of Tex., 85th Leg., R.S. 1332 (2017); H.J. of Tex., 85th Leg. R.S. 1749–50 (2017). Texas aims to "prevent taxpayer resources from supporting businesses which work to isolate Israel from global trade," because "Israel is a key ally and trading partner of the United States and Texas." *See* House Comm. on State Affairs, Bill Analysis, Tex. H.B. 89, 85th Leg., R.S. (2017); *see also* Senate Comm. on Bus. & Commerce, Bill Analysis, Tex. H.B. 89, 85th Leg., R.S. (2017). To combat these "discriminatory practices," Texas does not contract with a company for goods or services if that company refuses to deal with, terminates business activities with, or takes other actions intended to penalize, inflict economic harm on, or limit commercial relations with Israel (or someone doing business with Israel). TEX. GOV'T CODE §§ 808.001 & 2270.001. Texas does not, however, consider business actions taken "for ordinary business purposes" to be a boycott. *Id.* § 808.001.

---

[4] As discussed in more depth *infra*, House Bill 89 prohibits government contractors from boycotting Israel. House Bill 89 also contains a related, but distinct, provision not challenged here. In House Bill 89, the Legislature amended Chapter 808 of the Texas Government Code. Subject to limited exceptions, these amendments require governmental agencies to divest from companies that boycott Israel. *See* TEX. GOV'T CODE § 808.054(a). Because Plaintiffs' motions address the contracting provisions in Chapter 2270 exclusively, they have not properly preserved a constitutional claim vis-à-vis the divestment provisions in Chapter 808. In any event, they would lack standing to challenge those provisions because they have not alleged that the State has divested in their companies because of anti-Israel boycotts.

Chapter 2270 differs in two key respects from the EAA in that it: (1) applies to non-foreign-state-led boycotts of Israel, and (2) is not a direct regulation of the general public's conduct enforceable by felony prosecution. Instead, the law denies public contracts to businesses that are engaged in boycotts of Israel or will be engaged in a boycott of Israel during the contract's term. TEX. GOV'T CODE § 2270.002. As a result, the law requires public contractors to verify that the company "does not boycott Israel" and "will not boycott Israel during the term of the contract." *Id.*

## V.   The Legislature carefully crafted Chapter 2270 to apply to companies, not individuals.

In Chapter 2270, the Legislature defined the "companies" who must certify that they will not boycott Israel. These entities include "a for-profit sole proprietorship, organization, association, corporation, partnership, joint venture, limited partnership, limited liability partnership, or limited liability company, including a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of those entities or business associations that exists to make a profit." TEX. GOV'T CODE § 808.001(2).

Plaintiffs are sole proprietors who sought contracts with governmental entities, and thus, were required to certify, in their capacities as sole proprietors, that they would not engage in the discriminatory conduct Chapter 2270 proscribes. Plaintiff Bahia Amawi, a speech pathologist who has contracted with Pflugerville Independent School District in the past to provide speech therapy services, refused to certify that she "[d]oes not currently boycott Israel," and "[w]ill not boycott Israel during the term of the contract." Amawi Br. at 4. She avers that she "make[s] economic decisions on the basis of [her] support for Palestine and [her] ethical objections to Israel's mistreatment of Palestinians." Dec. of Bahia Amawi ¶ 9. She says, for example, that she buys Palestinian olive oil and "refuse[s] to buy the Sabra brand of hummus because of its connections to Israel." *Id.* Whenever she is aware that "products are made in or affiliated with Israel," she makes the "*personal* choice to avoid them." *Id.* (emphasis added).

The Pluecker Plaintiffs also refused to sign, or took issue with signing, the contractual clauses required by Chapter 2270. Plaintiff Zachary Abdelhadi is a sophomore at Texas State University who expressed an interest in judging high school debate tournaments the Lewisville Independent School District. *See* Dec. of Zachary Abdelhadi ¶¶ 3, 9. However, he refused to certify that he does not currently boycott Israel or that he will not boycott Israel during the term of the contract. *See id.* at ¶¶ 10–14. Abdelhadi's boycott is limited: he "does not boycott all Israeli companies; he boycotts only those supporting Israel's occupation of Palestinian territories." Pluecker Br. at 10.

Like Abdelhadi, Plaintiff Obinna Dennar judges high school debate tournaments. *See* Dec. of Obinna Dennar ¶ 3. In 2017, Dennar arranged to judge a debate tournament through Klein High School, but he refused to certify that he was not presently engaged in a boycott of Israel or that he would not be engaged in a boycott of Israel during the term of the contract. *See id.* at ¶¶ 7–8. Dennar asserts that he boycotts Israel, and he "do[es] not want to go against [his] political beliefs by signing the certification." *Id.* at ¶¶ 8–10. Also, like Abdelhadi, Dennar does not boycott all Israeli products— only those "he believes support Israel's occupation of the Palestinian territories or that, directly or indirectly, economically benefit the Israeli government, including Sabra and L'Oreal." Pluecker Br. at 8.

The final two plaintiffs contracted with state universities. Plaintiff George Hale is "a radio reporter for KETR, the NPR station for northeast Texas, which is licensed to Texas A&M University– Commerce ('TAMUC')." Dec. of George Hale ¶ 3. Hale contracts with TAMUC and is the radio station's lead reporter for an "investigative radio series and podcast." *Id.* Hale said that he "previously boycotted consumer goods offered by businesses supporting Israel's occupation of the Palestinian territories." *Id.* at ¶ 9. However, he asserts that he discontinued this boycott "when [he] was forced to sign a No Boycott of Israel certification" in order to continue working on the podcast series. *Id.* at ¶¶

10–11. Hale said that he did not wish to sign the certification, but he did so to continue working despite his objections. *Id.* at ¶ 18.

Finally, Plaintiff John Pluecker is "a freelance writer, artist, interpreter, translator, and co-founder of an interpretation collaborative called Antena." Dec. of John Pluecker ¶ 3. In March 2018, Pluecker agreed to translate an art essay for the Blaffer Art Museum at the University of Houston (UH) in exchange for $1,500. *Id.* at ¶ 10. Because he had previously done work for UH, Pluecker began working on the translation before reviewing the UH contract, and upon review, he refused to sign the contract and forfeited payment because the contract required a certification that he does not boycott Israel and will not do so during the life of the contract. *Id.* at ¶ 10–13. Specifically, he refused to sign the contract "because [he] believed it violated [his] free speech rights," and Pluecker "did not want to forfeit [his] participation in a BDS boycott campaign." *Id.* at ¶ 14. In a second instance, Pluecker refused to sign another contract with the certification provision and forwent an opportunity to be a guest speaker at UH. *Id.* at ¶¶ 16–17.

Plaintiffs contend that their personal decisions to purchase certain products or speak out on specific issues are inhibited by Chapter 2270. But, as discussed in more depth below, Chapter 2270 does not prevent Plaintiffs from engaging in the kind of personal, non-"company" actions they assert Chapter 2270 infringes.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). The decision to grant a preliminary injunction is to be treated as "the exception rather than the rule." *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975); *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). "In considering whether to grant or deny preliminary injunctive relief, the district court 'must remember that a preliminary injunction is an extraordinary and drastic remedy,' and that '[t]he movant has a heavy

burden of persuading the district court that all four elements are satisfied.'" *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (alteration in original) (footnotes omitted) (quoting *Callaway*, 489 F.2d at 573, and *Hardin v. Hous. Chronicle Publ'g Co.*, 572 F.2d 1106, 1107 (5th Cir. 1978)).

"Thus, if the movant does not succeed in carrying its burden on any one of the four prerequisites, a preliminary injunction may not issue and, if issued, will be vacated on appeal." *Id.* (citing *Clements Wire & Mfg. Co. v. NLRB*, 589 F.2d 894, 897 (5th Cir. 1979)). The moving party must establish the following four factors: (1) a substantial threat that failure to grant the injunction will result in irreparable injury; (2) a substantial likelihood of success on the merits; (3) the injunction will serve the public interest; and (4) the threatened injury outweighs any damage that the injunction may cause the opposing party. *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989). At all times, the burden of persuasion remains with the plaintiff as to each of the four elements. *Id.* Here, Plaintiffs cannot meet their heavy burden on even one of these four factors.

### ARGUMENT AND AUTHORITIES

Chapter 2270 does not concern mere criticism of Israel or its laws, leaders, or policies. The law concerns economic boycotts that target *all* Israelis *on the basis of nationality or national origin. Cf.* What to Boycott, https://bdsmovement.net/get-involved/what-to-boycott (last visited Jan. 15, 2019) ("The BDS movement calls for a boycott of all Israeli products."). This law, like many of the non-discrimination laws that protect vulnerable members of society, counters the use of economic coercion to strike not at Israeli actions but at the mere fact that a company *is* Israeli or does business with one. And Chapter 2270 does not even prohibit boycotts. Individual boycott supporters, outside of their businesses' voluntary commercial relations with the State, may act as they wish.

As can those who *oppose* such boycotts: Texas's refusal to spend its money in ways that countenance this form of boycott, like similar laws passed in other states, is simply an application of

two well-established doctrines: first, states can place conduct-based conditions or qualifications on independent contractors who seek to obtain the business of those states. And second, states, among these restrictions, may disallow contractors from engaging in invidious discrimination.

## I.      Chapter 2270 does not apply to Plaintiffs.

As an initial matter, because Plaintiffs have not met their burden of showing a harm caused by Chapter 2270, the Court should decline to address the merits of their challenges. *See, e.g.*, *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."). For the same reasons, Plaintiffs lack standing to challenge Chapter 2270 and will suffer no irreparable injury absent an injunction. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411, 422 (2013) (holding that Article III standing to challenge statute was lacking where the act "target[ed] other individuals.").

Plaintiffs do not identify any actions they have taken or plan to take that would constitute a "company" act within the meaning of Chapter 2270. The only anti-Israel activities that Amawi mentions, for example, are (1) buying Palestinian products like olive oil; and (2) refusing to buy Israeli products, like the Sabra brand of hummus, because of the products' connections to Israel. Amawi Dec. ¶ 9. Whenever she is aware that "products are made in or affiliated with Israel," she makes the "*personal* choice to avoid them." *Id.* (emphasis added). The Pluecker Plaintiffs engage in similar non-work-related decisions: Pluecker, for instance, boycotts Sabra products and contends "[i]t would go against his political and moral beliefs to go on record with or sign on to anything perceived to be an anti-BDS statement." Pluecker Br. at 5–6, These deeply personal choices, which are entirely divorced from the content of the contracts they signed with the State as sole proprietors, are not "company" actions within the meaning of Chapter 2270.

Chapter 2270 provides that a governmental entity may not enter into a contract with a *company* for goods or services unless the *company* certifies that it does not boycott Israel or will not boycott Israel. TEX. GOV'T CODE § 2270.002. Of course, any company that enters into a contract with a governmental entity would necessarily have a designated representative sign the contract on the company's behalf. But it does not follow that the *representative* of that company would be bound by the contract. So, a CEO of a Fortune 500 company might be required to sign a contract on the company's behalf that includes a certification under Chapter 2270, but the CEO herself could still engage in a "boycott of Israel" in her own time, even if that boycott would run afoul of the law if taken on behalf of the company.

Although sole proprietorships under Texas law raise slightly more nuanced issues, because, as in this case, sole proprietorships are most likely to be operated by the individual signing the contract, the same company/individual distinction applies. This means that Amawi could not boycott Israel in her capacity as a speech pathologist. But the actions she complains would be captured by Chapter 2270—for instance, deciding what products to buy at the grocery store, when shopping for her family—have nothing do with any of the tools that she needs to provide services to students. Likewise, Hale, a reporter, could not discriminate against an Israeli company as part of his duties for his radio station. But the only actions he identifies—boycotting an Israeli cosmetics company, for instance, Pluecker Br. at 13—are not tied to his reporting work. In fact, Pluecker Plaintiffs concede that their boycotts are "wholly unrelated to the contracting activities Plaintiffs seek to perform." Pluecker Br. at 23. This is a good thing. The economic and social decisions Plaintiffs are concerned about are unique to them, not their companies, and thus, are unrelated to the provisions in Chapter 2270. Although Plaintiffs raise doubts about what conduct falls within the scope of the statute, *e.g.*, Pluecker Br. at 31, the construction discussed above is simple, reasonable, and fully compliant with the First Amendment, and the Court is bound to apply it if there is any constitutional dubiety. *See, e.g.*, *National Fed'n of Indep.*

*Bus. v. Sebelius*, 567 U.S. 519, 563 (2012) ("'[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" (citation omitted)).

For these reasons, Plaintiffs can freely engage in the activities they describe in their declarations, and therefore lack standing to challenge Chapter 2270.

## II.    Plaintiffs cannot facially invalidate House Bill 89 on this record.

Constitutional challenges can either be brought as facial or as-applied claims. *See Justice v. Hosemann*, 771 F.3d 285, 295 (5th Cir. 2014). Although Amawi and the Pluecker Plaintiffs assert that they are seeking facial invalidation of Chapter 2270, *e.g.*, Amawi Br. at 8-2 at 12 ("H.B. 89 must be enjoined as facially unconstitutional."); Pluecker Br. at 1 ("[Plaintiffs] request that this Court issue a preliminary injunction against the enforcement of the Act."), nowhere does either brief cite the applicable standard of review for such a challenge—that "no set of circumstances exists under which [the law] would be valid or that the statute lacks any plainly legitimate sweep," or, if Plaintiffs are raising an overbreadth challenge, that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *Catholic Leadership Coalition of Texas v. Reisman*, 764 F.3d 409, 426 (5th Cir. 2014). In fact, the word "overbreadth" is not mentioned at all in either motion for preliminary injunction. And, at other points in their motions, Plaintiffs use the language of an as-applied challenge. *E.g.*, Amawi Br. at 1 ("Plaintiff Bahia Amawi now brings this action to enjoin enforcement of the Act as a violation of her fundamental First Amendment rights."); Pluecker Br. at 2 ("Absent a preliminary injunction, Plaintiffs will continue to be irreparably harmed by the law.").

The Fifth Circuit has admonished that "facial challenges to the constitutionality of statutes should be granted sparingly and only as a last resort, so as-applied challenges are preferred." *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2012). "Facial challenges 'often rest on speculation' because they do not involve specific applications of a statute, but rather hypothetical applications." *Id.*

(citation omitted). Moreover, they also "'threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.'" *Id.* (citation omitted). And "[i]nvalidating a law that is perfectly constitutional in some applications has 'obvious harmful effects.'" *Id.* (citation omitted).

Those concerns are pronounced here. Plaintiffs' briefing does not adequately explain, or even tries to explain, how Chapter 2270 is facially unconstitutional. Chapter 2270 applies to range of marketplace conduct, from a range of businesses, well beyond the specific facts Plaintiffs present in their motions. A grocery store cannot refuse to import fruits and vegetables from an Israeli farm. A tech company cannot decline to sign a multi-million-dollar contract to export systems to an Israeli corporation. Plaintiffs have come nowhere close to showing that the law is unconstitutional in all its applications or that it is substantially overbroad. And invalidating the entire statute would have the "obvious[ly] harmful effect[]" of preventing clearly constitutional applications of an anti-discrimination law that provides economic protection to a vital Texas ally and her citizens. For these reasons, and considering the judicial preference for as-applied challenges compared with facial ones, the Court should construe Plaintiffs' claims as an as-applied challenge to Chapter 2270. Properly construed, their claims still fail for the reasons discussed below.

## III.    Chapter 2270 does not violate the First Amendment.

Proceeding to the merits, Chapter 2270 is constitutional because: (1) it is aimed at discriminatory conduct; (2) a business's boycott of Israel is not protected speech under the First Amendment; and (3) Chapter 2270 does not restrict private speech, but is instead a limitation on Texas's commercial affairs.

However, even if Plaintiffs have articulated a viable First Amendment right to participate in their economic boycotts of Israeli businesses, that right is outweighed by the State's regulatory interest

in restricting government contractors from unlawful discrimination that has a long and unfortunate historical precedent.

### A.      Chapter 2270 is aimed at discriminatory conduct, not protected speech.

Through Chapter 2270, the Legislature regulated discriminatory conduct. As was true in *Rumsfeld v. FAIR*, in which law schools sought to boycott the military by banning military recruiters, Chapter 2270 only "affects what [Plaintiffs] must *do* . . . not what [Plaintiffs] may or may not say." 547 U.S. 47, 60 (2006).

For Plaintiffs' conduct to fall under the umbrella of First Amendment protection, the boycotting conduct must be "inherently expressive," as the Supreme Court unanimously explained in *FAIR*, *see id.* at 66. If explanatory speech is needed to convey a boycott's message, the boycotting conduct is not inherently expressive. *Id. FAIR* involved the attempted invocation of the First Amendment to protect a boycott. Specifically, *FAIR* addressed the Solomon Amendment, which coerced law schools (with the potential loss of federal funds) into engaging in conduct with which they disagreed—allowing the military equal access to their campuses for recruiting purposes. 547 U.S. at 51–55. The law schools sought to "restrict[] the access of military recruiters to their students because of disagreement with the Government's policy on homosexuals in the military," but were unwilling to forego federal funds. *Id.* at 51–52.

The law schools challenged the Solomon Amendment on First Amendment grounds. The Supreme Court, however, had little difficulty rejecting the law schools' arguments, concluding that Congress could even have imposed the requirements as a direct mandate. *Id.* at 58–70. The Court made clear that governmental regulation of boycotting activity neither compels nor prohibits any actual speech: "The Solomon Amendment neither limits what law schools may say nor requires them to say anything." *Id.* at 60. Thus, "the Solomon Amendment regulate[d] conduct, not speech. It affect[ed] what law schools must *do*—afford equal access to military recruiters—not what they

may or may not *say*." *Id.* So too here. Chapter 2270 does not require Plaintiffs to *say* anything or refrain from *saying* anything; it only constrains what they must *do* in their capacity as sole proprietors—*i.e.*, not boycott Israel if they wish to contract with the State.

The Court also made clear that for express-conduct claims "First Amendment protection [extends] only to conduct that is inherently expressive." *Id.* at 66. Excluding the military from campus did not qualify: if explanatory speech is needed to explain the "message" of conduct, it by definition is not *inherently* expressive. *Id.* Thus, "[t]he expressive component of a law school's actions [wa]s not created by the conduct itself but by the speech that accompanie[d] it." *Id.* And "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.* The *FAIR* plaintiffs' challenge thus failed.

The same result should be reached here. Nothing about Plaintiffs' desired actions of not purchasing certain products is inherently expressive. And so, just as in *FAIR*, the "actions [at issue] were expressive only because [plaintiffs] accompanied their conduct with speech explaining it." *Id.* *FAIR* also rejected the law schools' bootstrapping of the required "inherently expressive" analysis by pointing to the action being part of a larger campaign or message. The Supreme Court instead considered the inherent expressiveness of each action *individually*. 547 U.S. at 64–66. Therefore, it is appropriate here to review each Plaintiffs' action individually to determine if those actions come within Chapter 2270 and whether each individual action is inherently expressive. Under this framework, Plaintiffs cannot show that their individual decisions about which products to purchase (or not purchase) fall within the ambit of Chapter 2270 and are inherently expressive.

Finally, the Supreme Court rejected the law schools' freedom-of-association claim, explaining that "[s]tudents and faculty [were] free to associate to voice their disapproval of the military's message; nothing about the statute affects the composition of the group[.]" *Id.* at 69–70. That is equally true here. Plaintiffs are free to associate with anyone they want and to voice their

disapproval of Israel's policies. What Plaintiffs may not do is engage in particular economic conduct in their capacities as sole proprietors while operating under a contract with the State. If Plaintiffs' businesses are engaged in a different type of boycott—*e.g.*, a general boycott of companies whose practices it disagrees with—that would not be considered a boycott of Israel, regardless of whether Israel may be implicated in some attenuated manner.

### B.   The First Amendment does not protect secondary boycotts of Israeli companies.

The anti-Israel boycotts covered by Chapter 2270 are not protected under the First Amendment. *See International Longshoremen's Ass'n v. Allied International, Inc.* 456 U.S. 212 (1982). In *Longshoremen*, the president of the International Longshoremen's Association (ILA) "ordered ILA members to stop handling cargoes arriving from or destined for the Soviet Union" in protest of "the Russian invasion of Afghanistan." *Id.* at 214. In response to the order, the longshoremen on "the east and gulf coasts refused to service ships carrying Russian cargoes." *Id.* at 215. This had the effect of placing "a heavy burden on neutral employers" carrying the goods ILA was boycotting. *Id.* at 223.

The Supreme Court determined that ILA's boycott of Russian goods was illegal under the National Labor Relations Act as a secondary boycott. *Id.* at 226–27. The ILA's sole dispute was with the Soviet Union over its invasion of Afghanistan; however, the three companies that had to substantially cease doing business because of the direct economic pressure of the boycott had nothing to do with ILA's dispute. *See id.* at 223–24.   "[W]hen a purely secondary boycott reasonably can be expected to threaten neutral parties with ruin or substantial loss, the pressure on the secondary parties must be viewed as at least one of the objects of the boycott or the statutory prohibition would be rendered meaningless." *Id.* at 224 (internal quotation marks and citations omitted). The boycott in *Longshoremen* was "not a labor dispute with a primary employer but a political dispute with a foreign nation." *Id.* The Supreme Court has "consistently rejected the claim that secondary picketing by labor unions in violation of § 8(b)(4) is protected activity under the First Amendment." *Id.* at 226.

"[C]onduct designed not to communicate but to coerce merits still less consideration under the First Amendment." *Id.*

Likewise, in the context of the Arab boycott of Israel, the Seventh Circuit rejected an attempt by companies asserting that they had a First Amendment right "to answer questions asked by Arab boycott offices pursuant to the Arabs' trade boycott of Israel." *Briggs*, 728 F.2d at 916. The court noted that the "appellants [we]re free to communicate their views about the relative merits of the Arabs' political decisions"; they simply could not engage in particular conduct, including "furnish[ing] information about businesses relationships with boycotted countries or blacklisted persons in violation of the Act." *Id. Longshoremen* and *Briggs* collectively establish that commercial boycotts are not inherently protected speech.[5] (And here, by contrast to the laws in *Longshoremen* and *Briggs*, the Texas statute does not regulate conduct everywhere in the private sector; it regulates conduct *only* insofar as a company seeks the benefit of contractual relations with Texas.)

Much like the conduct described in *Longshoremen*, the companies that choose to boycott Israel as defined by the Texas law are engaging in coercive conduct that would "penalize, inflict economic harm on, or limit commercial relations with Israel, or with a person or entity doing business in Israel or in an Israeli-controlled territory." *See* TEX. GOV'T CODE § 808.001(1). Chapter 2270, however, does not go as far as the federal law in *Longshoremen* because it does not prohibit companies from engaging in coercive conduct or secondary boycotts aimed Israeli businesses or Israeli citizens. Rather, Texas narrowed its law to government contracts and chose to contract with companies that will not be engaged in boycotts of Israel during the term of the state contract.

---

[5] Chapter 2270 does not address any pure speech. "Boycott Israel" is defined to mean "[(1)] refus[ing] to deal, [(2)] terminating business activities with or [(3)] taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations" with respect to Israel. TEX. GOV'T CODE § 808.001(1). The first two terms refer to conduct alone. And the third refers to "any action," rather than any sort of speech or communication. Moreover, "any action" must be read under the *noscitur a sociis* canon (that the meaning of a word may be ascertained from words or phrases associated with it), and thus given a similar meaning as "refusing to deal" and "terminating business activities"—*i.e.*, also referring to types of economic conduct, not speech.

Plaintiffs contend that *NAACP v. Claiborne Hardware Co.* recognizes that boycotts are protected forms of speech or conduct. *E.g.*, Amawi Br. at 7. Therefore, they contend that Chapter 2270 infringes on their right to engage in protected speech and expressive conduct in violation of the First Amendment.[6] *See id.* This contention expands the scope of that opinion beyond what the Supreme Court contemplated. In *Clairborne*, a local branch of the NAACP organized a boycott of white merchants in Claiborne County, Mississippi who refused to meet their demands for racial equality. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 899–900 (1982) (listing the 19 specific demands including desegregation of all public schools, the hiring of black policemen and black store clerks, and integration of bus stations).

The Supreme Court determined that the nonviolent elements of the boycott were constitutional. *Id.* at 915. "The Court did not permit the boycotters . . . to target *all* whites because of their racial status or identity, but rather those local white merchants that had victimized the boycotters and violated their constitutional and statutory rights through discrimination." Goldfeder, *supra*, at 232; *see generally, Claiborne*, 458 U.S. at 898–902 & n. 30 (describing the racial inequalities that the boycott sought to correct and identifying when the boycott was lifted for a merchant who hired a black cashier in response to the boycott's demands). Read in context, *Claiborne* stands for the proposition that a nonviolent boycott focused on vindication of a Fourteenth Amendment individual right is protected by the First Amendment. *See* Goldfeder, *supra*, at 233. *Claiborne* does not address boycotts directed at a foreign nation—*Longshoremen*, by contrast, directly addresses that issue.

This case law establishes that merely labeling something a "boycott" does not itself sanctify conduct as "protected" speech. Amawi concedes this point by asserting that the law prevents her

---

[6] Plaintiffs also reference the district court opinions in *Jordahl v. Brnovick*, 336 F. Supp. 3d 1016 (D. Ariz. 2018) and *Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018) in which plaintiffs challenged laws in Arizona and Kansas prohibiting state entities from contracting with companies that boycott Israel. The Court should decline to follow those opinions. The district court in the *Koontz* case did not even cite to, or attempt to distinguish, *Longshoremen*, and the *Jordahl* court failed to adopt the state's narrowing construction of the statute, over-read *Clairborne*, and under-read *Longshoremen* and *Briggs*.

from engaging in "*protected* speech and expressive conduct." Amawi Br. at 7. By using the word "protected," she acknowledges that not all boycotts are, in fact, protected. Their lawfulness depends on their purpose.

Unlike the boycotters in *Claiborne*, Plaintiffs are not directly boycotting a person or entity to vindicate a constitutional right. Rather, they are engaged in a secondary boycott like the one in *Longshoremen*—choosing not to purchase products created in Israel in support of the BDS Movement. That is the BDS Movement's aim: to boycott *all* Israeli products because of the movement's dispute with the Israeli government's policies. At bottom, this means that Plaintiffs are choosing not to purchase goods from a company because of the place where the goods originated. These boycotts resemble the secondary boycotts described in *Longshoremen*. As the Supreme Court made clear there, the government may constitutionally ban a secondary boycott that injures neutral parties.

For these reasons, *Longshoremen*, *Briggs*, and *FAIR* foreclose Plaintiffs' claim that Chapter 2270 bars First Amendment protected activity.

### C.     Chapter 2270 is a restriction on government speech.

"When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2245 (2015) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009)). In *Walker*, the State of Texas was sued for allegedly violating a nonprofit organization's free speech rights by denying the organization's application to order personalized license plates with an image of the confederate flag. The Supreme Court "refused to hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals." *Id.* at 2246 (quoting *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)) (internal quotation marks and brackets omitted).

Generally, "when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position. In doing so, it represents its citizens and it carries out its duties on their behalf." *Id.*

Chapter 2270 espouses the State's policy of supporting Israel and takes the position that public funds will not be used to pay companies that choose to engage in a boycott that is contrary to this policy. It does not allocate state money for a program—it limits the payment of state money to companies that are not actively engaged in efforts that undermine Texas policy. Namely, it prevents the payment of public money to companies that choose to boycott Israel or boycott a person or entity doing business in Israel. TEX. GOV'T CODE § 808.001(1). Chapter 2270 does not compel speech. Nor does it restrict speech. Instead, Texas is advancing its own policy by preventing public money from being used to pay companies that intend "to penalize, inflict economic harm on, or limit commercial relations . . . with Israel. . . ." *Id.* Texas has not engaged in viewpoint discrimination simply because it chooses to advance its goal of supporting Israel over alternative goals.

## IV.   State and local governments may place lawful requirements and restrictions on independent contractors.

Even if Plaintiffs' desired conduct had any First Amendment value, Texas has multiple interests that sustain Chapter 2270 against any potential level of scrutiny that might apply. "The Constitution accords government officials a large measure of freedom" "in the course of contracting for goods and services." *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 724 (1996). Every state, for example, has enacted legislation  imposing competitive-bidding requirements on various types of contracts with the government. In fact, the "examples of federal, state, and local statutes, codes, ordinances, and regulations could be multiplied to fill many volumes," and  have  been means of regulating government contracts "since the founding of the Republic." *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 693–94 (1996) (Scalia, J., dissenting).

### A.  Texas can regulate economic activity.

It is "beyond dispute" that even those engaged in inherently expressive activities, such as publishing newspapers, may still be subject "to generally applicable economic regulations[.]" *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983). Newspapers can thus be subjected to antitrust laws, labor laws, and investigatory subpoenas even though such laws might incidentally burden expression. *Id.* (collecting cases).

"[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Airbnb, Inc. v. City & County of San Francisco*, 217 F. Supp. 3d 1066, 1076 (N.D. Cal. 2016) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)). Chapter 2270 regulates commercial activity to align commerce in Texas with the State's policy objectives and values.  *See, e.g.*, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991) ("The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals" and is a proper "basis for legislation.").  Israel is one of the few democracies in the Middle East and an ally of the United States and this State.  *See* 19 U.S.C. § 4452.  The State has reasonably acted to prevent commerce within Texas from being used as an economic weapon against Israel.

### B.  Texas can prohibit state contractors from violating anti-discrimination principles.

As discussed above, states routinely impose requirements and prohibitions on state contracts. Texas, for instance, may expressly prefer contractors that reside within its borders, and this is perfectly constitutional. TEX. GOV'T CODE § 2252.002; *see also, e.g.*, A.B. 280, § 5, 2017 Leg., 79th Sess. (Nev. 2017) (similarly reflecting a preference for contractors within its state's borders). Texas encourages its agencies and institutions of higher education to increase the number of contracts awarded to historically underutilized businesses owned by women, veterans, and racial minorities. TEX. GOV'T CODE §§ 2161.001–.003. States may also restrict the speech and conduct of contractors to protect against conflicts of interests and bribery: Texas prohibits state agencies from entering into

employment, professional services, or consulting contracts with a former or retired employee of the agency for one year from that person's last date of employment. TEX. GOV'T CODE § 2252.901.

States even impose moral requirements on contractors. Texas considers a bidder's "character, responsibility, [and] integrity," among other things, when deciding whether to award a contract. TEX. GOV'T CODE § 2156.007. In New Jersey, "the legislative mandate that a bidder be 'responsible' embraces moral integrity just as surely as it embraces a capacity to supply labor and materials." *Trap Rock Indus., Inc. v. Kohl*, 284 A.2d 161, 166 (N.J. 1971). Texas and many other states have now added, to this long preexisting list of qualifications, a requirement that state contractors refuse to participate in nationality-based boycotts of Israel. *See* TEX. GOV'T CODE §§ 2270.001–.002; Appendix, *infra*. By doing so, states are merely following the example set by the federal government since 1979. A state may exercise its power, with respect to state contracting, to advance public policy goals—whether in promoting the hiring of the less privileged, supporting local businesses, or, as here, eliminating invidious discrimination based on historically protected characteristics. Businesses have the choice to contract or not contract with the state. This voluntary decision does not lessen the state's power to place lawful requirements and restrictions on the independent contractors such as anti-discrimination rules.

The Supreme Court previously upheld a legislature's right to refuse to subsidize certain activity in *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983). In *Regan*, Congress chose to give non-profit organizations that engage in lobbying activities (501(c)(4) organizations) less favorable tax treatment than those that do not (501(c)(3) organizations). *See id.* at 543–44. That tax differential was challenged as placing an "unconstitutional condition" on exercising the right to lobby. *Id.* at 545. The challenge failed. The Court unanimously explained that "Congress has merely refused to pay for the lobbying out of public monies. This Court has never held that the Court must grant a benefit . . . to a person who wishes to exercise a constitutional right." *Id.* The

Court "again reject[ed] the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.'" *Id.* at 546 (citation omitted); *see also Agency for Intern. Development v. Alliance for Open Society Intern., Inc.*, 570 U.S. 205, 215 (2013) (discussing the holding of *Regan*). The Court further explained that the plaintiff organization could "obtain [the more favorable tax treatment] for its non-lobbying activity by returning to the dual structure it used in the past, with a § 501(c)(3) organization for non-lobbying activities and a § 501(c)(4) organization for lobbying." *Regan*, 461 U.S. at 544.

The same result is proper here. Texas's decision not to subsidize a boycott of Israel by providing public funds to businesses not engaged in such a boycott "has not infringed any First Amendment rights or regulated any First Amendment activity." *Id.* at 546. And to the extent Plaintiffs would like to engage in a boycott outside of their respective contracts, they may do so either in their personal capacity or through another business that does not contract with Texas.

*Regan* is not an outlier. Governments may condition public monies on acceptance of non-discrimination policies. Thus, for example, Congress could require a multi-state entity to refrain from discriminating against disabled individuals and waive sovereign immunity regarding discrimination claims as a condition of receiving funds. *See Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1170 (D.C. Cir. 2004); *see also Grove City Coll. v. Bell*, 465 U.S. 555, 575 (1984) (Congress could require universities to provide equal treatment to women as a condition of federal funds).

The Pluecker Plaintiffs ignore *Regan* and its progeny and instead cite *Pickering v. Board of Education*, 391 U.S. 563 (1968) for the proposition that Chapter 2270 improperly regulates protected speech of public contractors as citizens speaking on issues of public concern. *See* Pluecker Br. at 21. Notably, though, *Pickering* is only triggered when a public employee "[(1)] spoke as a citizen [(2)] on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). As discussed at length above, Chapter 2270 governs *conduct*, not speech. And Plaintiffs are contractors, not public employees.

Plaintiffs have not cited any authority extending the protections of *Pickering* to economic conduct. "*Pickering* is based on the insight that the speech of a public-sector *employee* may interfere with the effective operation of the government." *Janus v. AFSCME*, 138 S. Ct. 2448, 2473 (2018) (emphasis added). The Supreme Court recognized that *Pickering* is a "poor fit" for mandates imposed as a condition of public employment. *See id.* As a result, Plaintiffs conduct is not protected speech under *Pickering*. And, Texas may constitutionally condition receipt of public funds through state contracts on non-discrimination against Israel.

### C.   Chapter 2270 is a standard anti-discrimination measure.

American law teaches that it is wrongful to lay burdens on individuals on the basis of immutable characteristics like race, sex, or (as here) nationality, national origin, or religion. Chapter 2270 prohibits a business only from boycotting Israel by "refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations specifically with Israel, or with a person or entity doing business in Israel or in an Israeli-controlled territory," but does not include decisions made for ordinary business purposes.[7] TEX. GOV'T CODE § 2270.002; *Id.* § 808.001(1). Texas can refuse to fund these discriminatory acts.

Such laws frequently operate in commercial contexts like this one. For instance, Nevada (like most states) makes it unlawful for home owners to refuse to sell to someone on account of their origin, NEV. REV. STAT. § 118.100(1), or for hotels categorically to deny lodging to nationals of a certain country, NEV. REV. STAT. § 651.070. These direct restrictions on private business decisions pose no First Amendment problems. This Texas law is milder. Here, companies *can* decline to do

---

[7] The Pluecker plaintiffs object that the term "ordinary business purpose" is "not defined by Texas case law" and is thus unclear to a "person of ordinary intelligence." Pluecker Br. at 31. They cite no authority for the proposition that a term must be defined or analyzed in reported decisions to survive a constitutional vagueness challenge. And the term "ordinary business purpose" has a corollary in federal bankruptcy law, 11 U.S.C. § 547(c)(2), and can be understood to refer to actions that a company would take in the course of its business in the absence of any intention not to deal with a company merely because that company is based in Israel.

business with a company simply because it has an Israeli board member or sells products in Tel Aviv. Chapter 2270 just says: very well, but we can decline to do business with *you* because Texas refuses to fund discrimination based on nationality.

The Free Speech Clause lets the Texas government spend its own money to promote public interests, even when doing so works to the disfavor of some citizens. This happens all the time, in fact. The best analogy may be debarment laws. Debarment is the exclusion of a contractor from the privilege of obtaining government contracts for a certain period. Such laws, for instance, deny state contracts to companies who are found systematically to have refused to hire blacks or Hispanics. The government in doing so does not "chill" the right of companies to express the racial views or hiring preferences of its managers. It simply sends a counter-message that the state will not join hands economically with businesses who behave in this way.

The United States has long vigorously exercised its debarment power against contractors on this ground; it will even move to debar companies based on their failure to adhere to or provide an affirmative-action policy.[8] Companies can take controversial positions and use their dollars toward that end; but government, in turn, can decide that it will not subsidize discrimination by contributing *its* dollars to those companies. Debarment laws, in the end, are not understood to "suppress" a First Amendment right to engage in discriminatory practices. They are understood, rather, to entail that, as a result of such conduct, the company may forfeit state business. If a company can exert its economic leverage to try to injure Israel, Texas can exert a counter-force to try to mitigate that injury.

---

[8] Exec. Order No. 11246, §§ 212 & 301, 30 Fed. Reg. 12319 (Sept. 24, 1965); 48 C.F.R. § 9.406-2 (vigorously exercised); OFCCP v. Goya de Puerto Rico, Inc., Notice of Debarment, 67 Fed. Reg. 53028-01 (Dep't of Labor Aug. 14, 2002); OFCCP v. Pacific Coast Feather Co., Notice of Debarment, 61 Fed. Reg. 56248-01 (Oct. 31, 1996) (debarment action regarding affirmative action policies).

Thus, even if Plaintiffs' desired conduct was entitled to any First Amendment consideration, that interest is dramatically outweighed by the State's interest in combatting invidious, status-based discrimination in the sale of goods. *See, e.g.*, *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984). This goal is "unrelated to the suppression of expression [and] plainly serves compelling state interests of the highest order." *See id.* at 624. The State's compelling interest in prohibiting national-origin discrimination thus outweighs whatever (if any) First Amendment Interests Plaintiffs could have here.

## V.      The equitable considerations strongly counsel against an injunction.

Even if Plaintiffs could demonstrate a substantial likelihood that they will prevail on the merits, they also must establish an irreparable injury, that the injunction will serve the public interest and that the threatened injury outweighs any damage that the injunction may cause the opposing party. *CDL Mktg., Inc.*, 878 F.2d at 809. As explained above, they cannot establish an irreparable injury because there is no infringement on their constitutional rights, and they are free to engage in the activities contemplated in their declarations without fear that they will be boycotting Israel within the meaning of Chapter 2270.

Moreover, as addressed at length above, the equitable factors weigh heavily against an injunction. The State has deeply rooted interests in promoting its relationship with an important ally and preventing national origin discrimination. Chapter 2270 fulfills both of those purposes, and should not be enjoined on the weak showing that Plaintiffs have made in their motions for preliminary injunction. And, at a bare minimum, Plaintiffs have not demonstrated that the law is substantially overbroad and must be enjoined in all its applications.

### CONCLUSION

The movement to boycott companies and citizens based on nothing more than Israeli nationality is an attempt to injure an American ally and citizens of our ally who have no role in formulating foreign policy. Chapter 2270 simply provides that if a business chooses to engage in this

form of nationality-based discrimination, that business may be choosing to forgo the privilege of

receiving public money. Plaintiffs' motions for preliminary injunction should be denied.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

AMANDA J. COCHRAN-MCCALL
Chief for General Litigation Division

*/s/ Michael R. Abrams*
MICHAEL R. ABRAMS
Texas Bar No. 24087072
Assistant Attorney General
RANDALL W. MILLER
Texas Bar No. 24092838
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
Michael.Abrams@oag.texas.gov
Randall.Miller@oag.texas.gov

**Counsel for Defendant Ken Paxton**

## APPENDIX

## STATES THAT HAVE ADOPTED PROHIBITIONS ON FORMS OF BOYCOTTS AGAINST ISRAEL

**Alabama**
- SB 81, passed and signed into law in 2016
- https://legiscan.com/AL/text/SB81/2016

**Arizona**
- HB 2617, passed and signed into law in 2016
- https://www.azleg.gov/legtext/52leg/2r/bills/hb2617p.pdf

**Arkansas**
- SB 513 passed and signed into law in 2017
- http://www.arkleg.state.ar.us/assembly/2017/2017R/Bills/SB513.pdf

**California**
- AB 2844, passed and signed into law in 2016
- https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201520160AB2844

**Colorado**
- HB 16-1284 passed and signed into law in 2016
- http://leg.colorado.gov/bills/hb16-1284

**Florida**
- SB 86 passed and signed into law in 2016
- https://www.flsenate.gov/Session/Bill/2016/0086

**Georgia**
- SB 327 passed and signed into law in 2016
- http://www.legis.ga.gov/legislation/en-US/Display/20152016/SB/327

**Illinois**
- SB 1761 passed and signed into law in 2015
- https://legiscan.com/IL/text/SB1761/2015

**Indiana**
- HB 1378 passed and signed into law in 2016
- http://iga.in.gov/documents/39bbdf7f

**Iowa**
- HF 2331 passed and signed into law in 2016
- https://www.legis.iowa.gov/legislation/BillBook?ga=86&ba=HF%20233 1

**Kansas**
- HB 2482 passed and signed into law in 2018
- http://www.kslegislature.org/li/b2017_18/measures/hb2482/
- Modified by House Bill 2482, Laws 2018, ch. 60, § 2, eff. July 1, 2018

**Louisiana**
- Governor Edwards signed an executive order in 2018
- https://www.doa.la.gov/osp/PC/EO_JBE_2018-15_BDS_Israel.pdf

**Maryland**
- Governor Hogan signed an executive order in 2017
- https://content.govdelivery.com/attachments/MDGOV/2017/10/23/file_attachments/9 00819/Executive%2BOrder%2B01.01.2017.25.pdf

**Michigan**
- HB 5821 and HB 5822 were passed and signed into law in 2017
- http://www.legislature.mi.gov/documents/2015-2016/publicact/pdf/2016-PA-0526.pdf
- http://www.legislature.mi.gov/documents/2015-2016/publicact/pdf/2016-PA-0527.pdf

**Minnesota**
- HF 400 passed and signed into law in 2017
- https://www.revisor.mn.gov/bills/text.php?number=HF400&version=0&session_year=2 017&session_number=0&format=pdf

**Nevada**
- SB 26 passed and signed into law in 2017
- https://legiscan.com/NV/bill/SB26/2017

**New Jersey**
- A 925 passed and signed into law in 2016
- http://www.njleg.state.nj.us/2016/Bills/A1000/925_I1.PDF

**New York**
- Governor Cuomo signed an executive order in 2016

- https://www.governor.ny.gov/news/no-157-directing-state-agencies-and-authorities-divest-public-funds-supporting-bds-campaign

**North Carolina**
- HB 161 passed and signed into law in 2017
- http://dig.abclocal.go.com/wtvd/docs/032217-hb-161.pdf

**Ohio**
- HB 476 passed and signed into law in 2016
- https://www.legislature.ohio.gov/legislation/legislation-documents?id=GA131-HB-476

**Pennsylvania**
- HB 2107 passed and signed into law in 2016
- https://www.legis.state.pa.us/cfdocs/billinfo/billinfo.cfm?syear=2015&body=H&type=B&bn=2107

**Rhode Island**
- H 7736 passed and signed into law in 2016
- http://webserver.rilin.state.ri.us/billtext16/housetext16/h7736.pdf

**South Carolina**
- H 3583 passed and signed into law in 2015
- https://www.scstatehouse.gov/sess121_2015-2016/prever/3583_20150319.htm

**Texas**
- HB 89 passed and signed into law in 2017
- http://www.legis.state.tx.us/tlodocs/85R/billtext/html/HB00089I.htm

**Wisconsin**
- Governor Walker signed an executive order in 2017
- Assembly Bill 553 passed in 2018
- https://walker.wi.gov/press-releases/governor-walker-reaffirms-support-israel-signs-anti-bds-bill-law
- https://docs.legis.wisconsin.gov/2017/related/acts/248

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true and correct copy of the foregoing document was served upon Plaintiffs' counsel of record through the Court's electronic filing system on January 15, 2019.

<u>/s/ *Michael R. Abrams*          </u>
MICHAEL R. ABRAMS