# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

Bahia Amawi,
        *Plaintiff,*

v.

Pflugerville Independent School District; and Ken Paxton, in his official capacity as Attorney General of Texas,
        *Defendants.*

*and*

John Pluecker, Obinna Dennar, Zachary Abdelhadi, and George Hale,
        *Plaintiffs,*

v.

Ken Paxton, Texas Attorney General; Board of Regents of the University of Houston System, in the name of the University of Houston; the Trustees of the Klein Independent School District, in the name of Klein Independent School District; the Trustees of the Lewisville Independent School District, in the name of the Lewisville Independent School District; and the Board Of Regents of the Texas A&M University System, in the name of Texas A&M University-Commerce; in their official capacities,
        *Defendants.*

Civil Action No. 1:18-CV-1091-RP

Civil Action No. 1:18-CV-01100-RP

## PROPOSED AMICUS BRIEF OF THE STATE OF ARIZONA IN SUPPORT OF DEFENDANTS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION .............................................................................................................................. 1

ARGUMENT AND AUTHORITIES ................................................................................................. 2

    I.    PLAINTIFFS IGNORE CONTROLLING CASE LAW ................................................ 2

        A.    Plaintiffs Ignore *FAIR v. Rumsfeld* And Its "Inherently Expressive" Requirement 2

        B.    Plaintiffs Also Ignore *Longshoremen* ........................................................................... 4

    II.    PLAINTIFFS' RELIANCE ON *JORDAHL* AND *KOONTZ* IS MISPLACED. ....... 5

        A.    Plaintiffs' Reliance On *Jordahl* Is Misplaced As That Decision Is Unsound ............ 5

        B.    *Koontz* Gratuitously And Erroneously Decided Issues Not Even Presented, And Should Not Be Relied Upon Here ................................................................................ 8

    III.    TEXAS'S STATUTE IS A VALID ANTI-DISCRIMINATION MEASURE .......... 9

        A.    Chapter 2270 Properly Advances Texas's Compelling Interest In Prohibiting Discrimination ................................................................................................................ 9

        B.    Anti-Discrimination Measures Are Content And Viewpoint Neutral ..................... 11

    IV.    PLAINTIFFS' REQUEST FOR FACIAL RELIEF IS IMPROPER ..................... 11

CONCLUSION ................................................................................................................................ 12

# TABLE OF AUTHORITIES

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*
    486 U.S. 492 (1988) ............................................................................................................... 7
*Athenaeum v. Nat. Lawyers Guild, Inc.*
    2017 WL 1232523 (N.Y. Sup. Ct. Mar. 30, 2017) ................................................................. 7
*Board of Directors of Rotary Int'l v. Rotary Club of Duarte*
    481 U.S. 537 (1987) ............................................................................................................. 11
*FAIR v. Rumsfeld*
    291 F. Supp. 2d 269 (D.N.J. 2003) ........................................................................................ 6
*FTC v. Superior Court Trial Lawyers Ass'n*
    493 U.S. 411 (1990) ............................................................................................................... 7
*Horne v. Flores*
    557 U.S. 433 (2009) ............................................................................................................. 12
*International Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*
    456 U.S. 212 (1982) ..................................................................................................... 1, 4, 5, 6
*Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*
    968 F.2d 286 (2d Cir. 1992) ................................................................................................... 7
*Jordahl v. Brnovich*
    336 F. Supp. 3d 1016 (D. Ariz. 2018) ......................................................................... 1, 5, 6, 7
*Koontz v. Watson*
    283 F. Supp. 3d 1007 (D. Kan. 2018) ......................................................................... 1, 5, 8, 9
*Lewis v. Casey*
    518 U.S. 343 (1996) ............................................................................................................. 11
*NAACP v. Claiborne Hardware Co.*
    458 U.S. 886 (1982) ............................................................................................................... 7
*Pickup v. Brown*
    740 F.3d 1208 (9th Cir. 2014) ................................................................................................ 2
*Rumsfeld v. FAIR*
    547 U.S. 47 (2006) ........................................................................................................ passim
*United States v. O'Brien*
    391 U.S. 367 (1968) ............................................................................................................... 4
*United States v. Salerno*
    481 U.S. 739 (1987) ............................................................................................................. 11
*Virginia v. Hicks*
    539 U.S. 113 (2003) ............................................................................................................. 11
*Wisconsin v. Mitchell*
    508 U.S. 476 (1993) ............................................................................................................. 11

**Statutes**

29 U.S.C. §631 .......... 13

**Other Authorities**

Brian Hauss, *Kansas Doesn't Even Try to Defend Its Israel Anti-Boycott Law*, ACLU (Nov. 30, 2017, 3:00 PM) .......... 11

**INTRODUCTION**

Both sets of Plaintiffs' motions are premised on legal arguments that directly contravene controlling and unanimous Supreme Court precedents—*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) and *Int'l Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*, 456 U.S. 212 (1982)—that each demonstrate that Plaintiffs enjoy no First Amendment right to demand subsidization of their boycotts of Israel with funds paid by Texas taxpayers.

Ignoring completely these controlling decisions, Plaintiffs instead rely on two non-precedential district court decisions in *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016 (D. Ariz. 2018) and *Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018). But those decisions are badly reasoned and should not be followed here. The former has been appealed by Arizona and is unlikely to survive appellate review for the reasons discussed below. And the latter was not only ultimately "dismissed with prejudice" with "the preliminary injunction … dissolved," *Koontz* Dkt. 33 at 1 (June 29, 2018), but the decision itself involved the wholly unnecessary resolution of First Amendment issues for which the briefing was entirely one-sided: the *Koontz* defendant offered no argument on the First Amendment claim and the issue should have been resolved by forfeiture alone.

In addition, neither set of Plaintiffs adequately addresses Texas's compelling interests in prohibiting discrimination against Israelis and those doing business with Israelis. Amawi ignores this dispositive issue entirely. And Pluecker wrongly suggests both that (1) the targeted intentional infliction of economic pain on Israelis (and those doing business with them) could never be deemed discrimination against Israelis (even where the inflictor does so for no other nationality) and (2) Chapter 2270 is not a valid anti-discrimination law even if selective boycotts directed only at one nationality are discriminatory. But Texas has compelling interests here, and

1

because Texas's statute is a valid anti-discrimination law, it directly follows that the statute is content- and viewpoint-neutral under well-established Supreme Court precedents.

Plaintiffs also appear to seek a blanket injunction against all enforcement of Chapter 2270. But that could only be appropriate if the statute were facially invalid, and neither set of Plaintiffs even attempts to satisfy the standards for facial relief. A statewide injunction would thus constitute both a clear error of law and a grave abuse of discretion.

For all of these reasons, this Court should deny Plaintiffs' motions for a preliminary injunction.

## ARGUMENT AND AUTHORITIES

### I. PLAINTIFFS IGNORE CONTROLLING CASE LAW

Plaintiffs' preliminary injunction motions ignore adverse Supreme Court precedent, including the Supreme Court's most recent decision analyzing whether a boycott enjoyed First Amendment protection. When those controlling and unanimous precedents are considered, it becomes clear that Plaintiffs' motions must be rejected.

#### A. Plaintiffs Ignore *FAIR v. Rumsfeld* And Its "Inherently Expressive" Requirement

Both sets of Plaintiffs ignore the Supreme Court's unanimous and *controlling* decision in *FAIR*, which is the Supreme Court's most recent statement in this context and a decision on all fours with the facts presented here. As *FAIR* explained, because boycotting (*i.e.*, selective refusals to deal/buy) is conduct rather than pure speech, it could only enjoy First Amendment protection if it were "inherently expressive" conduct. 547 U.S. at 66 (The Supreme Court "ha[s] extended First Amendment protection *only* to conduct that is inherently expressive." (emphasis added)); *Pickup v. Brown*, 740 F.3d 1208, 1225 (9th Cir. 2014) ("The Supreme Court has made

2

clear that First Amendment protection does not apply to conduct that is not 'inherently expressive.'" (quoting *FAIR,* 547 U.S. at 66)).

This "inherently expressive" test is a threshold, dispositive requirement. And yet neither set of Plaintiffs *even acknowledges* that requirement, let alone demonstrates that they satisfy it. And *FAIR* specifically addressed whether similar boycotting conduct was inherently expressive and concluded that it was not.

*FAIR* considered whether there was a First Amendment right to boycott the military based on disagreement with governmental policy. 547 U.S. at 66. There, Congress refused to subsidize with federal funds law schools that boycotted the military for on-campus recruiting due to their disagreement with the military's then "Don't Ask, Don't Tell" policy. *Id.* at 51-52. *FAIR* explained that if "explanatory speech is necessary" to convey the political message of the conduct at issue, that "is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection[.]" *Id.* at 66.

The Court's analysis in *FAIR* is squarely on point here. Absent explanatory speech, no reasonable observer is likely to understand the purported "message" conveyed by Plaintiffs' commercial purchasing decisions, such as purchasing a Dell computer instead of one from Hewlett Packard, or buying a different type of hummus. Only by explicating why, for example, she bought hummus made by Trader Joe's rather than Sabra with explanatory speech would any reasonable observer have any clue that Plaintiff Amawi's grocery purchase was somehow related to Israeli governmental policy.

*FAIR* also notably rejected the law schools' attempted bootstrapping of the required "inherently expressive" analysis, which pointed to the boycotting action being part of a larger campaign or message. The Supreme Court thus considered the inherent expressiveness of each

action *individually*.  547 U.S. at 64-66.  That same approach precludes any injunctive relief here, because the purchase decisions at issue here are not even minimally expressive—let alone *inherently* expressive—when considered on their own, without explanatory speech.

*FAIR* further explained that the anti-boycotting statute in that case did not implicate the First Amendment because it "affect[ed] what [plaintiffs] must *do* … not what they may or may not *say*," and thus was constitutional.  *Id.* at 60.  So too here.  The Act does not require Plaintiffs to *say* anything or refrain from *saying* anything; it only constrains what they must *do*—*i.e.*, not boycott Israel.  Texas's statute is thus constitutional for the same reasons the Solomon Amendment was in *FAIR*.

Finally, *FAIR* made plain that even if the boycotting conduct were inherently expressive, it only would have been subject to intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367, 384 (1968)—not strict scrutiny as both sets of Plaintiffs contend.  *FAIR*, 547 U.S. at 67.  And for substantially the same reasons as in *FAIR*'s alternative holding, the Texas statute survives review under *O'Brien*.  Indeed, neither set of Plaintiffs has even attempted to argue that the statute is unconstitutional under that governing standard.

### B.  Plaintiffs Also Ignore *Longshoremen*

Plaintiffs similarly fail to address the Supreme Court's decision in *Longshoremen*.  There, a union "stop[ped] handling [Russian] cargoes … to protest the Russian invasion of Afghanistan."  456 U.S. at 214.  The "'[u]nion's sole dispute [wa]s with the USSR over its invasion of Afghanistan,'" which the Court acknowledged was political.  *Id.* at 223-26.

Faced with an unlawful secondary-boycott claim, the union in *Longshoremen* attempted to raise a First Amendment defense.  But the Court *unanimously* rejected the purported "right" to engage in a political boycott against the U.S.S.R.:  prohibiting the union's boycott did "not infringe upon the First Amendment rights of the [union] and its members."  *Id.* at 226.  The

4

Court further explained that it was "even clearer that conduct designed not to communicate but to coerce merits still less consideration under the First Amendment." *Id.* at 226. The BDS-type boycotts regulated by the Texas's statute similarly do not seek to persuade Israel that its policies should be changed because they are in error, but instead seek to coerce a change in those policies through deliberate infliction of economic pain.

*Longshoremen* is on all fours here: Replace "union" with "lawyer," "Soviet Union" with "Israel," and occupation of "Afghanistan" with "the West Bank," and that effectively is this case. Plaintiffs' First Amendment claim here should fare no better than in *Longshoremen*.

## II.   PLAINTIFFS' RELIANCE ON *JORDAHL* AND *KOONTZ* IS MISPLACED.

Ignoring both *FAIR* and *Longshoremen*, Plaintiffs instead rely heavily on district court decisions in *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016 (D. Ariz. 2018) and *Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018). But those non-precedential decisions are manifestly wrong, and should not be followed by this Court.

### A. Plaintiffs' Reliance On *Jordahl* Is Misplaced As That Decision Is Unsound

The district court's decision in *Jordahl* entered a blanket, statewide injunction against all enforcement of an Arizona statute equivalent to Texas's. But that decision, which is currently on appeal, is plainly wrong for four reasons.

*First*, *Jordahl* distinguished *FAIR* on a single basis that is demonstrably false. The *Jordahl* court acknowledged that under *FAIR*, the *Jordahl* court "agree[d] [with Arizona] that the commercial actions (or non-actions) of one person, e.g., the decision not to buy a particular brand of printer … is typically only expressive when explanatory speech accompanies it." 336 F. Supp. 3d at 1042. But the *Jordahl* court nonetheless refused to follow *FAIR* because, in its view, *FAIR* did not apply "when a statute requires a company … to promise to refrain from … [boycotting] taken in response to *larger calls* to action," *id.* (emphasis added). Underscoring the

5

centrality of this reasoning/distinction, the *Jordahl* court repeated this "larger call" rationale four other times. *Id.* at 1033, 1038, 1048, 1050.

But the *Jordahl* court's "larger call" distinction is untenable. The boycotts in *FAIR* were also undeniably in "response to larger calls to action"—indeed, virtually every law school in the nation opposed the military's then "Don't Ask, Don't Tell" policy, and each boycotted the military based on that "larger call." *FAIR v. Rumsfeld*, 291 F. Supp. 2d 269, 280-81 (D.N.J. 2003). And there was never any doubt that the law schools' actual *speech* opposing that policy—*i.e.*, a very "large[] call to action"—was protected under the First Amendment. *FAIR*, 547 U.S. at 60. But it was equally clear that the law schools' boycotting conduct in "response to larger calls to action" enjoyed no such protection—indeed not a *single Justice* thought otherwise. *Id.* at 61-70.

*Second*, the *Jordahl* court wrongly distinguished *Longshoremen,* reasoning that *Longshoremen* "does not purport to state that there is no constitutional right to engage in boycotting activities," but instead relied upon "the [labor-law] context in which this type of governmental infringement … is justified." 336 F. Supp. 3d at 1041.

That was patent error. *Longshoremen* did not recognize a First Amendment interest and then conclude that "governmental infringement" of that interest was justified by the government's purportedly unique interest in regulating labor law. Indeed, *Longshoremen*'s terse analysis is dismissive of the idea that any First Amendment interest existed *at all*, announcing succinctly what all nine Justices considered obvious: there was no "protected activity under the First Amendment." 456 U.S. at 226-27. That conclusion is underscored by the absence of any discussion of compelling state interests or narrow tailoring. And underscoring that *Longshoremen* was not limited to the union context, the Court explained that the case involved

6

"not a labor dispute with a primary employer but a political dispute with a foreign nation." *Id.* at 224.

*Third*, *Jordahl* placed improper, overwhelming reliance on *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). But in doing so, the court failed to address the Supreme Court's explanation that *Claiborne* was predicated on the boycotters there having "sought only the equal respect and equal treatment to which [the boycotters] were constitutionally entitled." *FTC v. Super. Ct. Trial Lawyers Ass'n,* 493 U.S. 411, 426 (1990). BDS boycotts, however, do not seek to vindicate anyone's constitutional rights. Indeed, they actually *perpetuate* discriminatory conduct—by deliberate infliction of economic injury on Israelis and those doing business with them. The Second Circuit thus found *Claiborne* "readily distinguishable" where the desired boycott sought "to achieve an objective prohibited by valid state and federal [anti-discrimination] statutes." *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc,* 968 F.2d 286, 297-98 (2d Cir. 1992). And the *Jordahl* court similarly failed to account for the fact that the Supreme Court has refused to extend *Claiborne* to "commercial activity with a political impact." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 507-08 (1988); *accord FTC,* 493 U.S. at 426 (declining to extend *Claiborne* to commercial boycott by attorneys).

*Fourth*, the *Jordahl* court wrongly discounted Arizona's compelling interests in prohibiting discrimination on the basis of national origin/nationality by denying that boycotts of Israelis are in any way discriminatory. 336 F. Supp. 3d at 1048-49. Yet to refuse to do business with individuals and entities on the basis of their nationality is to discriminate on the basis of nationality/national origin—*by definition*. *See*, *e.g.*, *Athenaeum v. Nat'l Lawyers Guild, Inc.*, No. 653668/16, 2017 WL 1232523, at *5-7 (N.Y. Sup. Ct. Mar. 30, 2017) (holding that blanket

7

refusal to deal "because Plaintiff [wa]s an Israeli corporation" stated viable claim of national-origin discrimination). Boycotts against Israel and Israelis are national-origin discrimination under any reasonable construction of that term, just as blanket refusals to conduct any business with Canadians, Mexicans, or the Dutch would be. Plaintiffs' reasoning flouts the obvious truism that Israel is overwhelmingly populated by *Israelis*—i.e., individuals and businesses with Israeli national origin. To boycott Israel is necessarily to discriminate on the basis of Israeli national origin. And such boycotts necessarily inflict uniquely disfavored treatment—*i.e.*, *discrimination*—on one particular group: those with Israeli national origin, who bear the brunt of the economic pain that BDS boycotts specifically intend to inflict upon them.

For all of these reasons, *Jordahl* does not support a preliminary injunction here.

### B. *Koontz* Gratuitously And Erroneously Decided Issues Not Even Presented, And Should Not Be Relied Upon Here

Plaintiffs also place heavy reliance on the District of Kansas's decision in *Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018). But it too is misplaced: that decision is best understood as being akin to a default judgment rather than a fully-reasoned decision following complete briefing on the First Amendment merits.

Notably, Kansas's brief in *Koontz* did not address the merits of the First Amendment claim, or indeed ever use the words "First Amendment"—as Pluecker's counsel has gleefully noted. *See* Brian Hauss, *Kansas Doesn't Even Try to Defend Its Israel Anti-Boycott Law*, ACLU (Nov. 30, 2017, 3:00 PM), https://www.aclu.org/blog/kansas-doesnt-even-try-defend-its-israel-anti-boycott-law. As Pluecker's counsel aptly described it, "The state [Kansas] quite literally has no defense for the law's First Amendment [alleged] violations." *Id.* Because the merits of the First Amendment claim were not briefed by Kansas, it is hardly surprising that the state did not prevail on that issue.

8

In any event—and perhaps unsurprisingly given the completely one-sided nature of the First Amendment merits briefing—*Koontz* profoundly misapprehended the governing law. *Koontz* simply asserted—without any explanation—that the political boycotts in *FAIR* and *Koontz* were somehow different: "Because the Kansas Law regulates inherently expressive conduct and forces plaintiff to accommodate Kansas's message, it is unlike the law at issue in *Rumsfeld*." 2018 WL 617894, at *11.  But the *Koontz* court did not identify any facets of Koontz's boycott that were any different from *FAIR*.  Notably, both involved boycotts and both were motivated by disagreements with governmental policy set forth by statute.

*Koontz* does not provide a single intelligible or principled basis for distinguishing between the inherent expressiveness of political boycotts in *FAIR* and *Koontz*.  Nor could it. Moreover, *Koontz* also does not attempt to address *Longshoremen* or *Briggs* (likely because none of those cases were brought to the court's attention).

Because Kansas did not address the First Amendment merits in its opposition to the preliminary injunction motion, the district court should have resolved the likelihood-of-success-on-the-merits factor simply by forfeiture and left it at that.  Its contrary decision reflects both unwarranted judicial activism (*i.e.*, resolving issues not actually in dispute) and clear legal error.

### III.    TEXAS'S STATUTE IS A VALID ANTI-DISCRIMINATION MEASURE

#### A. Chapter 2270 Properly Advances Texas's Compelling Interest In Prohibiting Discrimination

Amawi's motion fails to consider the possibility that Texas's statute could be justified by the State's compelling interest in prohibiting discrimination.  And while Pluecker does address that possibility, the attempt to deny that compelling interest fails for two fundamental reasons.

*First*, as discussed above, boycotting Israelis and those doing business with them is *ipso facto* national origin/nationality discrimination.  *Supra* at [[9-10]].  Pluecker attempts to evade

9

this simple truth by contending (at 27) that "Mr. Abdelhadi does not boycott every Israeli company." That is unavailing. By that logic, if a business owner refused to serve all those with Mexican and Canadian national origin *except* those from Baja and Quebec, that would not be national-origin discrimination against Mexicans and Canadians. But that has never been the law. Discrimination is not shielded from the government's regulatory power simply because it is not carried out to its furthest possible ends. Discriminating against only some members of a group based in part on their membership in that group is more than sufficient to constitute "discrimination" that a government may lawfully prohibit—or *at least* decline to subsidize with public funds.

*Second*, Pluecker argues (at 26) that Texas's statute is "wildly under-inclusive because it permits discrimination on the basis of nationality for *every other country* except Israel." But a legislature's decision not to ban all conceivable discrimination is perfectly constitutional. Congress, for example, has chosen to protect only those who are 40-or-more years old from age discrimination—thereby prohibiting discrimination against the old but not the young. *See* 29 U.S.C. §631. But that has never been invalidated as impermissible viewpoint-discrimination. So too here.

Moreover, Pluecker's position would demolish sanctions law—much of which mandate boycotts against specific countries. If, for example, Plaintiffs have a First Amendment right not to do business with Israel, why would they also not have a corresponding right to do business *with* countries like North Korea, Iran, Sudan, or Apartheid South Africa? Certainly doing business with such countries would have far more obvious expressive value than commercial supply decisions: intentionally buying a product with a "Made in North Korea" label is, after all, *a lot* more expressive than buying hummus from Trader Joe's. And how could singling out

10

North Korea alone for sanctions be viewpoint neutral if singling out Israel for anti-boycott protection is impermissible viewpoint discrimination?

More fundamentally, decisions about what classes to protect from discrimination are reserved to legislatures—not courts, and certainly not litigants. Texas's statute may not be what Plaintiffs would have enacted had they controlled the Texas Legislature, but their mere political preferences do not render anti-discrimination laws they dislike unconstitutional.

### B. Anti-Discrimination Measures Are Content And Viewpoint Neutral

Because Chapter 2270 is a valid anti-discrimination statute, it follows that it is viewpoint neutral. Under Supreme Court precedents, it is well-established that anti-discrimination laws "'make[] no distinctions on the basis of the organization's viewpoint.'" *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987). Instead, "federal and state antidiscrimination laws … [are] permissible content-neutral regulation[s] of conduct." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (emphasis added).

### IV. PLAINTIFFS' REQUEST FOR FACIAL RELIEF IS IMPROPER

Both sets of Plaintiffs appear to be seeking a statewide, facial injunction. But such facial relief would only be proper if the Plaintiffs could satisfy either the "no set of circumstances" standard of *United States v. Salerno*, 481 U.S. 739, 745 (1987), or the overbreadth standard for First Amendment Claims, *see, e.g.*, *Virginia v. Hicks*, 539 U.S. 113, 119-20 (2003) ("[W]e have insisted that a law's application to protected speech be 'substantial' … before applying the 'strong medicine' of overbreadth invalidation[.]"). But Plaintiffs do not even attempt to satisfy either.

Moreover, the Supreme Court has explained that "two instances [of constitutional violations] were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief." *Lewis v. Casey*, 518 U.S. 343, 359 (1996). There similarly is

no basis for systemwide relief here based on the handful of plaintiffs now before this court.  In addition, *Horne v. Flores* reversed a statewide injunction where "the only violation claimed or proven was limited to a single district."  557 U.S. 433, 470-71 (2009).  That aptly describes this case.

The *Jordahl* court did issue a blanket, statewide injunction, but it notably did not conduct *any* analysis that might have supported that sweeping relief.  Indeed, its facial holding is somewhat bizarrely announced in a section addressing whether to impose a bond requirement sought by no one.  336 F. Supp. 3d. at 1050.  That unreasoned, unsupported, *ipse dixit* announcement provides no support for a blanket injunction or holding of facial invalidity here.

## CONCLUSION

Plaintiffs' motions for a preliminary injunction should be denied.


Respectfully submitted.

MARK BRNOVICH
ATTORNEY GENERAL

s/ Diana Day
Drew C. Ensign
Diana Day
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone:  (602) 542-5025
Facsimile:  (602) 542-4377
***Counsel for the State of Arizona***

## **CERTIFICATE OF SERVICE**

      I certify that a true and correct copy of the foregoing document was served upon counsel of record for Plaintiffs and Defendants through the Court's electronic filing system on January 22, 2019.

                                                    s/ Diana Day
                                                    Diana Day