IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Bahia Amawi,<br>    *Plaintiff,*<br><br>v.<br><br>Pflugerville Independent School District; and<br>Ken Paxton, in his official capacity as<br>Attorney General of Texas,<br>    *Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 1:18-CV-1091-RP<br><br>*consolidated with:*<br><br>Civil Action No. 1:18-CV-1100-RP |

### D<small>EFENDANT</small> K<small>EN</small> P<small>AXTON'S</small> O<small>MNIBUS</small> M<small>OTION</small> T<small>O</small> D<small>ISMISS</small>

Plaintiffs in these consolidated cases challenge a recently enacted anti-discrimination law prohibiting state entities from contracting with companies that boycott Israel. *See* T<small>EX</small>. G<small>OV'T</small> C<small>ODE</small> § 2270.001 *et seq.* To facilitate compliance, the law requires those companies to certify that they are not currently boycotting and do not intend to boycott Israel for the length of the state contract. *Id.* § 2270.002. General Paxton opposed Plaintiffs' respective motions for preliminary injunction, *see* Doc. 25, and now seeks dismissal of Plaintiffs' claims in their entirety. In a similar case challenging Arkansas' anti-boycott Israel law, the Eastern District of Arkansas determined that a boycott of Israel "is not speech, inherently expressive activity, or subject to independent constitutional protection" and, on that basis, concluded that the plaintiff had failed to state a viable claim for relief. *Arkansas Times LP v. Mark Waldrip, et al.*, --- F. Supp. 3d ---, 2019 WL 580669, at *7 (E.D. Ark. Jan. 23, 2019). The same result is warranted here. Chapter 2270 regulates economic conduct and does not implicate any rights protected under the First Amendment. Plaintiffs' claims should be dismissed.

### B<small>ACKGROUND</small>

**I.  The Texas Legislature Passes House Bill 89.**

The Texas Legislature enacted House Bill 89 in 2017 by wide bipartisan margins. The law passed unanimously in the House, and 26-5 in the Senate. *See* H.B. 89, S.J. of Tex., 85th Leg., R.S.

1332 (2017); H.J. of Tex., 85th Leg. R.S. 1749–50 (2017). Texas aims to "prevent taxpayer resources from supporting businesses which work to isolate Israel from global trade," because "Israel is a key ally and trading partner of the United States and Texas." *See* House Comm. on State Affairs, Bill Analysis, Tex. H.B. 89, 85th Leg., R.S. (2017); *see also* Senate Comm. on Bus. & Commerce, Bill Analysis, Tex. H.B. 89, 85th Leg., R.S. (2017). To combat these "discriminatory practices," Texas does not contract with a company for goods or services if that company refuses to deal with, terminates business activities with, or takes other actions intended to penalize, inflict economic harm on, or limit commercial relations with Israel (or someone doing business with Israel). TEX. GOV'T CODE §§ 808.001 & 2270.001. Texas does not, however, consider business actions taken "for ordinary business purposes" to be a boycott. *Id.* § 808.001.

In Chapter 2270, the Legislature circumscribed the "companies" who must certify that they will not boycott Israel. These companies include "a for-profit sole proprietorship, organization, association, corporation, partnership, joint venture, limited partnership, limited liability partnership, or limited liability company, including a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of those entities or business associations that exists to make a profit." TEX. GOV'T CODE § 808.001(2).

## II. Plaintiffs Refuse to Sign Chapter 2270's Certification Provision.

Plaintiffs claim that they are sole proprietors who sought contracts with governmental entities, and thus, were required to certify, in their capacities as sole proprietors, that they would not engage in the discriminatory conduct Chapter 2270 proscribes. Plaintiff Bahia Amawi, a speech pathologist who previously contracted with Pflugerville Independent School District to provide speech therapy services, refused to certify that she does not currently boycott Israel and will not boycott Israel during the term of her contract. Amawi Compl. ¶ 4. She "boycotts products created in Israel in support of the peaceful Palestinian Boycott, Divestment, and Sanctions movement." *Id.* ¶ 34.

The Pluecker Plaintiffs also refused to sign, or took issue with signing, the contractual clauses required by Chapter 2270. Plaintiff Zachary Abdelhadi is a sophomore at Texas State University who expressed an interest in judging high school debate tournaments the Lewisville Independent School District. *See* Pluecker Compl. ¶ 66. However, he refused to certify that he does not currently boycott Israel or that he will not boycott Israel during the term of the contract. *See id.* at ¶ 72. Abdelhadi's boycott is limited: he "does not boycott all Israeli companies; he boycotts only those supporting Israel's occupation of Palestinian territories." *Id.* at ¶ 68. Like Abdelhadi, Plaintiff Obinna Dennar judges high school debate tournaments. *Id.* ¶ 50. In 2017, Dennar arranged to judge a debate tournament through Klein High School, but he refused to certify that he was not presently engaged in a boycott of Israel or that he would not be engaged in a boycott of Israel during the term of the contract. *See id.* at ¶¶ 53–55.

The final two plaintiffs contracted with state universities. Plaintiff George Hale is "a radio reporter for KETR, the NPR station for northeast Texas, which is licensed to Texas A&M University–Commerce ('TAMUC')." *Id.* ¶ 81. Hale contracts with TAMUC and is the radio station's lead reporter for an investigative radio series and podcast. *Id.* Hale said that he previously "boycotted consumer goods offered by businesses supporting Israel's occupation of the Palestinian territories." *Id.* at ¶ 85. However, he asserts that he discontinued this boycott "when [he] was forced to sign a No Boycott of Israel certification" in order to continue working on the podcast series. *Id.* at ¶ 87. Hale said that he did not wish to sign the certification, but he did so to continue working despite his objections. *Id.* at ¶ 88.

Finally, Plaintiff John Pluecker is "a freelance writer, artist, interpreter, translator, and co-founder of an interpretation collaborative called Antena." *Id.* ¶ 29. In March 2018, Pluecker agreed to translate an art essay for the Blaffer Art Museum at the University of Houston (UH) in exchange for $1,500. *Id.* at ¶ 36. Because he had previously completed work for UH, Pluecker began working on

the translation before reviewing the UH contract, and upon review, he refused to sign the contract and forfeited payment because the contract required a certification that he does not boycott Israel and will not do so during the life of the contract. *Id.* at ¶ 37–38. Specifically, he refused to sign the contract "because [he] believed it violated [his] free speech rights," and Pluecker "did not want to forfeit [his] participation in a BDS boycott campaign." *Id.* at ¶ 14. In a second instance, Pluecker refused to sign another contract with the certification provision and forwent an opportunity to be a guest speaker at UH. *Id.* ¶¶ 41–42.

### III. Plaintiffs Assert Violations of the First and Fourteenth Amendments.

Broadly, all Plaintiffs make the same foundational claim, which, in turn, is the primary focus of this motion: that Chapter 2270 violates the First Amendment because "[t]he politically motivated boycott of consumer goods and services offered by companies operating in Israel, and/or Israeli settlements in the occupied Palestinian territories, is speech and expressive activity related to a matter of public concern." Pluecker Compl. ¶ 104; *see* Amawi Compl. ¶ 42.

Both Plaintiffs also raise several related First Amendment theories. They allege, for instance, that Chapter 2270 constitutes content and viewpoint discrimination and compelled speech. Pluecker Compl. ¶ 108; *see* Amawi Compl. ¶ 43–44. And, under the Fourteenth Amendment, Plaintiffs contend that Chapter 2270 is unconstitutionally vague. Pluecker Compl. ¶ 109; *see* Amawi Compl. ¶ 50.

### STANDARD OF REVIEW

A complaint must be dismissed if the plaintiff fails to state a claim upon which relief may be granted, *see* FED. R. CIV. P. 12(b)(6). To avoid dismissal, a plaintiff must plead sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While the Court must accept all factual allegations as true, the Court

"do[es] not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005); *see also Iqbal*, 556 U.S. at 679.

In evaluating a motion to dismiss, a district court should employ a two-pronged approach. First, the court should identify and set aside "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Second, the court should assume the veracity of the plaintiff's "well-pleaded factual allegations . . . and then determine whether they plausibly give rise to an entitlement for relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). If the factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then the complaint fails to show a plausible claim for relief. *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

The court should dismiss a complaint if the plaintiff has failed to "nudge[] [his] claims" of unlawful conduct "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. In other words, if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," then the complaint fails to "show[] that the pleader is entitled to relief" under Rule 8(a)(2) and must be dismissed. *Iqbal*, 556 U.S. at 679. Likewise, a court should dismiss when, based on the plaintiff's own allegations, he has no cognizable claims.

## ARGUMENT AND AUTHORITIES

Plaintiffs have not pleaded sufficient facts to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. Boycotting Israel is not protected by the First Amendment. Because the conduct that Chapter 2270 proscribes is clear, and because that conduct does not implicate the First Amendment or constitute viewpoint discrimination, Plaintiffs' primary First Amendment claim fails. Once that claim fails, the remainder of Plaintiffs' arguments fall with it. For instance, to fall afoul of the compelled-speech doctrine, a certification requirement must require contractors to certify that

they do not and will not engage in some protected speech, expressive conduct, or protected associational activity (e.g., political party membership). Thus, whether under Plaintiffs' theory that Chapter 2270 unconstitutionally prohibits Israel boycotting, or under their theory that it unconstitutionally compels certifications not to boycott Israel, Plaintiffs can only succeed if boycotting Israel is itself protected by the First Amendment.

## I. Economic Boycotts of Israel Are Not Protected by the First Amendment.

The First Amendment only protects speech or "conduct that is inherently expressive." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 66 (2006). To prevail on their First Amendment claims, Plaintiffs must show that boycotting Israeli products is either speech or inherently expressive conduct.

The act of refusing to buy a product because of the activities or residence of its maker is neither speech nor inherently expressive conduct—no more so than the act of refusing to purchase a product only because one does not like it. Rather, such acts are pure conduct that is merely motivated by beliefs that can take protected form. *See, e.g.*, *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (finding no First Amendment protection for a law firm's gender-discriminatory partner-selection practices, regardless of the potential First Amendment status of the beliefs motivating those practices).

Boycotting is plainly not speech. Whatever speech may accompany boycotting, the act itself does not communicate through words or any other inherently expressive medium. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) (discussing a variety of "mediums of expression" that are protected speech). Boycotters boycott by refusing to buy things, often without any accompanying speech.

As was true in *FAIR*, in which law schools sought to boycott the military by banning military recruiters, Chapter 2270 only "regulates conduct, not [protected] speech. It affects what [Plaintiffs] must *do* . . . not what [Plaintiffs] may or may not say." 547 U.S. 47, 60 (2006). Under *FAIR*, if explanatory speech is needed to convey a boycott's message then the boycotting conduct is not

inherently expressive. *Id.* at 66. *FAIR* involved the attempted invocation of a wide variety of First Amendment doctrines to protect a boycott. Specifically, *FAIR* addressed the Solomon Amendment, which coerced law schools (with the potential loss of all federal funds) into engaging in conduct with which they disagreed—allowing the military equal access to their campuses for recruiting purposes. 547 U.S. at 51–55. The law schools desired to boycott the military based on political disagreement with then-U.S. policy regarding homosexuals in the military, but were unwilling to forego federal funds. *Id.* at 51–52.

The law schools challenged the Solomon Amendment on First Amendment grounds. The Supreme Court dismantled the law schools' arguments, concluding that Congress could even have imposed the requirements as a direct mandate. *Id.* at 58–70. The Court made clear that governmental regulation of boycotting activity neither compels nor prohibits any actual speech: "The Solomon Amendment neither limits what law schools may say nor requires them to say anything." *Id.* at 60. Thus, "the Solomon Amendment regulate[d] conduct, not speech. It affect[ed] what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id. FAIR* is dispositive of Plaintiffs' claims here.

Chapter 2270 does not require Plaintiffs to *say* anything or refrain from *saying* anything; it only constrains what they must *do* in their capacity as sole proprietors—*i.e.*, not boycott Israel if they wish to contract with the State.

The Court also made clear that for express-conduct claims "First Amendment protection [extends] only to conduct that is inherently expressive." *Id.* at 66. Excluding the military from campus did not qualify: if explanatory speech is needed to explain the "message" of conduct, it by definition is not *inherently* expressive. *Id.* Thus, "[t]he expressive component of a law school's actions [wa]s not created by the conduct itself but by the speech that accompanie[d] it." *Id.* And "[i]f combining speech

and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.* The *FAIR* plaintiffs' challenge thus failed.

The same result should be reached here. Nothing about Plaintiffs' desired action of not buying certain products is inherently—or even particularly—expressive. And so, just as in *FAIR*, the "actions [at issue] were expressive only because [plaintiffs] accompanied their conduct with speech explaining it." *Id. FAIR* also rejected the law schools' bootstrapping of the required "inherently expressive" analysis by pointing to the action being part of a larger campaign or message. The Supreme Court instead considered the inherent expressiveness of each action *individually*. 547 U.S. at 64–66. Therefore, it is appropriate here to review each Plaintiffs' action individually to determine if those actions fall within Chapter 2270 and whether each individual action is also inherently expressive. Under this rubric, Plaintiffs cannot show that their individual decisions about which products to purchase (or not purchase) fall within the ambit of Chapter 2270 and are inherently expressive. *Cf. Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 549–50 (5th Cir. 2008) (finding that ordinance requiring bar to take "necessary steps" to stop smoking regulates conduct, not speech, and that the bar and employees "remain free to express whatever views they have on the ordinance.").

Finally, the Supreme Court rejected the law schools' freedom-of-association claim, explaining that "[s]tudents and faculty [were] free to associate to voice their disapproval of the military's message; nothing about the statute affects the composition of the group[.]" *Id.* at 69–70. That is equally true here. Plaintiffs are free to associate with anyone they want and to voice their disapproval of Israel's policies. What Plaintiffs may not do is engage in particular economic conduct in their capacities as sole proprietors while operating under a contract with the State.

The law regulates conduct that is neither expressive nor a form of speech. Plaintiffs' attempt to construe an individual's refusal to deal, or her purchasing decisions, as inherently expressive when

connected to a larger social movement or based on her personal beliefs falls short of qualifying as protected conduct.

The Supreme Court did not establish an unqualified constitutional right to boycott in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). In contrast, the Supreme Court upheld the government's ability to regulate boycotts in *International Longshoremen's Ass'n v. Allied International, Inc.*, 456 U.S. 212 (1982). In *Longshoremen's*, the Supreme Court held that a union's "boycott" of Soviet goods, *id.* at 214, taken "to protest the Russian investigation of Afghanistan," *id.*, was not protected by the First Amendment. *See id.* at 226–27. Specifically, the Longshoremen's union at issue there refused to unload cargoes shipped from the Soviet Union, forcing importers to import goods from elsewhere. *See id.* at 214–16. The Court first held that the union's boycott was an illegal secondary boycott under the National Labor Relations Act, *see id.* at 218–26, *i.e.*, a boycott intended to force others to cease trading in Soviet goods. The Court then rejected the union's First Amendment defense, reasoning that it had "consistently rejected the claim that secondary picketing by labor unions . . . is protected activity under the First Amendment," *id.* at 226, and that "[i]t seems still clearer that conduct not designed to communicate but to coerce merits still less consideration under the First Amendment." *Id.* The Court then quoted a passage from one of its secondary picketing opinions explaining that secondary-picketing bans permissibly "affect[] only that aspect of [a] union's efforts to communicate its views that calls for an automatic response to a signal, rather than a reasoned response to an idea[.]" *Id.* at 226 n.26 (internal quotation marks omitted) (quoting *NLRB v. Retail Store Emps. Union, Local 1001*, 447 U.S. 607, 619 (1980) (Stevens, J., concurring in part and concurring in the result)). Finally, the Court observed that "[t]here are many ways in which a union and its individual members may express their opposition to Russian foreign policy without infringing upon the rights of others." *Id.* at 227.

The public-contractor boycotts of Israel that Chapter 2270 prohibits are materially identical, for First Amendment purposes, to the boycott the Court held was unprotected by the First

Amendment in *Longshoremen's*. Like the *Longshoremen's* boycott, the purpose of anti-Israel boycotts is to coerce others to change their behavior. The ultimate goal of anti-Israel boycotts is to coerce Israel to change policies that the boycotters find objectionable. *See* Palestinian BDS National Committee, *What is BDS?*, https://bdsmovement.net/what-is-bds (explaining that the Boycott, Divestment, Sanctions (BDS) movement "urges action to pressure Israel"). But the intermediate goal of such boycotts is to coerce businesses to stop doing business with or in Israel. *See* Palestinian BDS National Committee, *Economic Boycott*, https://bdsmovement.net/economic-boycott (boasting that the BDS movement's economic boycotting has been a "key factor" in a sharp decline in foreign investment in Israel, has caused major companies to "exit[] the Israeli market," pushed Israel's largest agricultural exporter into bankruptcy by "push[ing]" Israeli farmers to export their produce through different exporters, and "forced" other companies to close their operations in what the movement labels Palestinian territory). This kind of coercion is not protected by the First Amendment. As in *Longshoremen's*, people and businesses who oppose Israel have multiple ways of expressing their opposition without coercing others.

Contrast *Longshoremen* with the facts and the Supreme Courts' decision in *Claiborne*. In 1965, Charles Evers organized the Claiborne County Branch of the NAACP in Claiborne County, Mississippi. *See Claiborne*, 458 U.S. at 898. The local chapter of the NAACP that Evers organized petitioned public officials to desegregate. *See id.* at 899. The petition did not receive a favorable response, and the local NAACP consequently voted unanimously to boycott white business. *See id.* at 900. In response, white merchants sued the NAACP and black citizens who participated in the boycott. *See id.* at 889–90. The state courts found the defendants liable for malicious interference with the plaintiffs' businesses, *see id.* at 891, and concluded that the boycott and the speech encouraging it were unprotected by the First Amendment. *See id.* at 895.

The Supreme Court reversed. The Court began its analysis of whether the defendants' activities were protected by the First Amendment by observing that the "boycott . . . took many forms." *Id.* at 907. First, the Court observed, "[t]he boycott was launched at a meeting . . . attended by several hundred persons." *Id.* Second, its purpose was to "secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice." *Id.* Third, it was "supported by speeches and nonviolent picketing." And fourth, "[p]articipants repeatedly encouraged others to join in its cause." *Id.* The Court explained that "[e]ach of *these elements* of the boycott"—public meetings, lists of demands, speeches, nonviolent picketing, encouraging others to join—"is a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments." *Id.* (emphasis added). The Court proceeded to explain why each of these elements of the boycott was protected. It explained that under settled doctrine the First Amendment protected the freedom of association and peaceable assembly, *see id.* at 908–09, that it protected the boycotters' "peaceful picketing," *id.* at 909, that it protected the boycotters' "public address" promoting the boycott and "personal solicitation" encouraging others to join, *id.*, and that it even protected the boycotters' "'threat[s]' of social ostracism," inasmuch as those threats were expressed in speech. *Id.* at 910.

"In sum," the Court found, "the boycott clearly *involved* constitutionally protected activity"—namely, the "elements of speech, assembly, association, and petition" that accompanied the boycott itself. *Id.* at 911 (emphasis added). Nowhere in its opinion did the Court say that the act of refusing to buy from white merchants itself was protected by the First Amendment. Rather, what the Court held protected were the boycotters' list of demands, the meetings they held to organize the boycott, and the speech they made to promote it—speech for which Evers and his cohorts were specifically held liable by the state courts. *See id.* at 902, 906, 926–29 (discussing the state trial court's reliance on Evers's speeches).

The Court's analysis did not end there. Even though the state courts had imposed liability on the defendants for pure First Amendment speech, assembly, and petition, the Court acknowledged that "[t]he presence of [this] protected activity . . . d[id] not end the relevant constitutional inquiry." *Id.* at 912. This was so because federal and state governments may regulate even "nonviolent and totally voluntary boycotts [that] have a disruptive effect on local economic conditions," or, under cases like *Longshoremen's*, "may . . . prohibit[]" union "[s]econdary boycotts and picketing[.]" *Id.* (citing *Longshoremen's*, 456 U.S. at 222–23; *N.L.R.B. v. Retail Store Emp. Union, Local 1001*, 447 U.S. 607, 617–18 (1980)).

Plaintiffs contend that *Claiborne* recognizes that boycotts are protected forms of speech or conduct. Therefore, they contend that Chapter 2270 infringes on their right to engage in protected speech and expressive conduct in violation of the First Amendment. But "[e]ven if *Claiborne* stands for the proposition that the act of refusing to deal enjoys First Amendment protection, such a right is limited in scope." *Waldrip*, 2019 WL 580669, at *6. The *Claiborne* boycotters "sought to vindicate rights of equality and freedom that lie at the heart of the Fourteenth Amendment itself." *Claiborne*, 458 U.S. at 914. As a result, "*Claiborne* applies to nonviolent, primary political boycotts to vindicate particular statutory or constitutional interests." *Waldrip*, 2019 WL 580669, at *6. "This . . . does not include political boycotts directed towards foreign governments concerning issues that do not bear on any domestic legal interest." *Id.* at *7. In *Longshoremen*, the Supreme Court "held that there is no unqualified right to boycott or a constitutional right to refuse to deal, or perhaps no First Amendment interest in boycotting at all." *Id.* (citing *Longshoremen's*, 456 U.S. at 226).

For these reasons, individual purchasing decisions are not protected by the First Amendment. Because Chapter 2270 does not infringe on Plaintiffs' constitutional rights, Plaintiffs have failed to state a claim for which relief can be granted.

## II. Chapter 2270 Does Not Constitute Viewpoint Discrimination.

As General Paxton discussed at length in his omnibus response to the motions for preliminary injunction, Chapter 2270 is a valid anti-discrimination measure. *See* Doc. 25 at 23–25. It thus follows that the law is viewpoint neutral because anti-discrimination laws "'make[] no distinctions on the basis of the organization's viewpoint.'" *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987). Instead, as Arizona correctly pointed out in its amicus brief, "federal and state antidiscrimination laws … [are] permissible content-neutral regulation[s] of conduct." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (emphasis added).

## III. Chapter 2270 Does Not Compel Speech.

Plaintiffs also wrongly contend that Chapter 2270 requires Plaintiffs to speak. It does not. As *Waldrip* recognized, "[c]ertification requirements for obtaining government benefits, including employment or contracts, that merely elicit information about an applicant generally do not run afoul of the First Amendment." *Waldrip*, 2019 WL 580669, at *4. Certification requirements are not "compulsion[s] to disseminate a particular political or ideological message," *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995), as laws that unconstitutionally compel speech generally are, *see id.*, but rather, require contractors "only to provide the government with information" about whether they meet government contracting requirements. *Id.* Requirements "to provide the government with information" do not generally implicate compelled-speech concerns. *Id.*

Certifications become "constitutionally problematic" when they require that an applicant certify that it "'will not engage . . . in protected speech activities' or 'associational activities within constitutional protection.'" *Waldrip*, 2019 WL 580669, at *4 (quoting *Cole v. Richardson*, 405 U.S. 676, 680 (1972)). As *Waldrip* found, and as this Court should find for the reasons discussed above, economic boycotts of Israel do not require a certification that a contractor refrain from engaging in

protected speech activities or associational activities that are constitutionally protected. Accordingly, Plaintiffs' compelled speech claim should be dismissed.

### IV. Plaintiffs' Vagueness Challenges Fail.

The construction of Chapter 2270 described above—which establishes the boundaries of the purely economic conduct prohibited by the law—is straightforward and fully compliant with the First Amendment. The Court is bound to apply it if there is any constitutional dubiety. *See, e.g.*, *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012) ("'[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" (citation omitted)).

Under this construction of Chapter 2270, the law does not restrict, or even address, any protected speech. "Boycott Israel" is defined to mean "[(1)] refus[ing] to deal, [(2)] terminating business activities with or [(3)] taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations" with respect to Israel. TEX. GOV'T CODE § 808.001(1). The first two terms refer to conduct alone. And the third refers to "any action," rather than any sort of speech or communication. Moreover, "any action" must be read under the *noscitur a sociis* canon (that the meaning of a word may be ascertained from words or phrases associated with it), and thus given a similar meaning as "refusing to deal" and "terminating business activities"—i.e., also referring to types of economic conduct, not speech. *Cf. Waldrip*, 2019 WL 580669, at *4 ("While the statute also defines a boycott to include "other actions that are intended to limit commercial relations with Israel," Ark. Code Ann. § 25-1-502(1)(A)(i), this restriction does not include criticism of Act 710 or Israel, calls to boycott Israel, or other types of speech. Familiar canons of statutory interpretation, such as constitutional avoidance and *ejusdem generis*, counsel in favor of interpreting 'other actions' to mean commercial conduct similar to the listed items."). Because Chapter 2270 may be understood, and applied solely to, economic boycotts of Israel, the law is not unconstitutionally vague.

## CONCLUSION

For the reasons set forth above, General Paxton requests that the Court dismiss Plaintiffs' claims with prejudice.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

AMANDA J. COCHRAN-MCCALL
Chief for General Litigation Division

*/s/ Michael R. Abrams*
MICHAEL R. ABRAMS
Texas Bar No. 24087072
Assistant Attorney General
RANDALL W. MILLER
Texas Bar No. 24092838
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
Michael.Abrams@oag.texas.gov
Randall.Miller@oag.texas.gov

**Counsel for Defendant Ken Paxton**

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was served upon Plaintiffs' counsel of record through the Court's electronic filing system on February 19, 2019.

*/s/ Michael R. Abrams*
MICHAEL R. ABRAMS