## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| Amawi, | § | Civil Action No.: 1:18-CV-1091-RP |
| *Plaintiff,* | § | [Lead Case] |
| | § | |
| v. | § | |
| | § | |
| Pflugerville I.S.D., et al., | § | |
| *Defendants,* | § | |
| | § | |
| | § | |
| Pluecker, et al., | § | Civil Action No. 1:18-CV-1100-RP |
| *Plaintiff,* | § | [Consolidated Case] |
| | § | |
| v. | § | |
| | § | |
| Paxton, et al., | § | |
| *Defendants.* | § | |

## *PLUECKER* PLAINTIFFS' RESPONSE TO ATTORNEY GENERAL
## PAXTON'S MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

ARGUMENT ......................................................................................................... 3

   I. Plaintiffs have sufficiently pled that the Act violates the First Amendment............... 3

     A. The First Amendment protects the right to join in a political consumer boycott. . 3

     B. *Longshoremen* and *Rumsfeld* Are Inapposite........................................................ 7

     C. The First Amendment's protection is not limited only to speech that bears on
domestic legal interests. ............................................................................................. 10

     D. The Act discriminates on the basis of content and viewpoint............................ 12

     E. The Act compels speech...................................................................................... 13

   II. Plaintiffs have sufficiently pled that the Act is impermissibly vague..................... 14

Conclusion ............................................................................................................. 16

# TABLE OF AUTHORITIES

## Cases

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988) .................................................................................................... 6

*Arkansas Times LP v. Waldrip*,
    No. 4:18-CV-00914 BSM, 2019 WL 580669 (E.D. Ark. Jan. 23, 2019) ............................ 9, 10

*Baggett v. Bullitt*,
    377 U.S. 360 (1964) ............................................................................................... 10, 15

*Baird v. State Bar of Arizona*,
    401 U.S. 1 (1971) ..................................................................................................... 14

*Board of Directors of Rotary Int'l v. Rotary Club of Duarte*,
    481 U.S. 537 (1987) ................................................................................................. 12

*Boos v. Barry*,
    485 U.S. 312 (1988) ................................................................................................. 11

*Brown v. Ent. Merchants Ass'n*,
    564 U.S. 786 (2011) ................................................................................................. 13

*Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*,
    454 U.S. 290 (1981) ................................................................................................... 9

*Cole v. Richardson*,
    405 U.S. 676 (1972) ................................................................................................. 14

*Echols v. Parker*,
    909 F.2d 795 (5th Cir. 1990) ....................................................................................... 4

*FTC v. Superior Court Trial Lawyers Ass'n*,
    493 U.S. 411 (1990) ................................................................................................... 6

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984) ................................................................................................... 12

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ................................................................................................. 12

*Int'l Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*,
    456 U.S. 212 (1982) ................................................................................................ 1, 7

*Jordahl v. Brnovich*,
    336 F. Supp. 3d 1016 (D. Ariz. 2018) ............................................................. 2, 8, 9

*Koontz v. Watson*,
    283 F. Supp. 3d 1007 (D. Kan. 2018) ........................................................... 8, 11, 14

*Moonin v. Tice*,
    868 F.3d 853 (9th Cir. 2017) .................................................................................. 10

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ............................................................................................... 12

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ....................................................................................... passim

*Nat'l Ass'n of Mfrs. v. S.E.C.*,
    748 F.3d 359 (D.C. Cir. 2014) ............................................................................... 14

*Nat'l Inst. of Family & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) ........................................................................................... 13

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ............................................................................................... 13

*Robinson v. Reed*,
    566 F.2d 911 (5th Cir. 1978) ................................................................................. 14

*Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*,
    547 U.S. 47 (2006) ......................................................................................... passim

**Texas Statutes**

Tex. Gov. Code § 808.001 ................................................................................................ 2, 15

Texas Government Code § 2270 ............................................................................................. 1

iii

## INTRODUCTION

Plaintiffs John Pluecker, Obinna Dennar, Zachary Abdelhadi, and George Hale (hereinafter "Plaintiffs") brought this suit to challenge Texas' anti-boycott law, House Bill 89 (reflected in Texas Government Code § 2270 *et seq*.) (the "Act"). The Act requires all state contractors to certify that they do not and will not participate in boycotts of Israel or Israeli-controlled territories while contracting with the state. Plaintiffs have pled that the Act is unconstitutional because it: (1) forces companies that wish to contract with the State to sacrifice their First Amendment right to engage in political boycotts of Israel; (2) seeks to suppress political expression based on its content and viewpoint; (3) compels speech by forcing contractors to publicly disavow any boycott participation; and (4) is so vague that a person of ordinary intelligence cannot ascertain what the law prohibits or allows.

Although the Supreme Court recognized that the First Amendment protects political consumer boycotts in *NAACP v. Claiborne Hardware Co*., Attorney General Paxton seeks to dismiss Plaintiffs' claims by arguing that boycotts constitute unprotected economic conduct. Paxton relies on two cases: (1) *International Longshoremen*, which predates *Claiborne* and is cabined to secondary labor boycotts; and (2) *Rumsfeld v. FAIR*, an opinion that does not even mention the word "boycott." Paxton disregards the central holding of *Claiborne*, and ignores the fact that *Claiborne* is the only one of these three cases to consider a politically-motivated consumer boycott like those at issue here.[1]

Paxton also argues that, even if some political consumer boycotts are protected, this protection extends only to boycotts directed at a domestic legal interest. But the Supreme Court

---

[1] Paxton's arguments in his Motion to Dismiss largely duplicate argument he has already raised in response to Plaintiffs' Motion for a Preliminary Injunction. Plaintiffs hereby incorporate their Motion for a Preliminary Injunction. Dkt. No. 14 in Civil Action No. 1:18-CV-01100-RP, and their Reply In Support Thereof, Dkt No. 40 in Civil Action No. 1:18-cv-01091-RP.

has never held that First Amendment protections are limited to expression about domestic legal disputes, and accepting that view would have absurd and dire consequences. It would mean that boycotts throughout our history that aimed to make change abroad could have been outlawed, from the Quaker-led transatlantic boycott of the slave-labor economy of the nineteenth century up through the boycott of apartheid South Africa. *See* Amicus Curiae Brief of Professor Lawrence Glickman In Support of Plaintiffs-Appellees, *Jordahl v. Brnovich*, Case No. 18-16896 (9th Cir. Jan. 24, 2019), Doc. 71 (Glickman Br.), *available at* https://www.aclu.org/sites/default/files/field_document/glickman_amicus_brief.pdf.

Paxton also argues that the Act cannot be viewpoint-based because it is a valid anti-discrimination measure. This cannot be squared with the Act's plain text, which applies only to boycotts of Israel and which prohibits refusing to deal with Israel or any company or person that does business in Israel or an Israeli-controlled territory *regardless of national origin, religion, or nationality*. Thus, the prohibition is not tied, much less narrowly tailored, to the State's asserted interest in combatting discrimination. In fact, the Act does not prohibit discrimination at all unless it involves a boycott of Israel, nor does it prohibit a boycott of Israel conducted "for ordinary business purposes."

Finally, Paxton argues that Plaintiffs fail to state a vagueness claim because the Act clearly proscribes only economic conduct. This is not at all clear from the Act's text, which defines "Boycott Israel" to mean "refusing to deal with, terminating business activities with, *or otherwise taking any action* that is intended to penalize, inflict economic harm on, or limit commercial relations specifically with Israel, or with a person or entity doing business in Israel or in an Israeli-controlled territory." Tex. Gov. Code § 808.001(1) (emphasis added). But even if Paxton were right that the Act merely proscribes economic conduct, a person of reasonable

intelligence simply cannot discern which economic acts would be considered "intended to penalize [or] inflict economic harm on Israel," particularly given the Act's exemption for boycotts undertaken "for ordinary business purposes."

Because Plaintiffs have sufficiently alleged that the Act violates their First and Fourteenth Amendment rights, Paxton's motion to dismiss should be denied.

## ARGUMENT

I.    **Plaintiffs have sufficiently pled that the Act violates the First Amendment.**

    A.    **The First Amendment protects the right to join in a political consumer boycott.**

*NAACP v. Claiborne Hardware Co*., 458 U.S. 886 (1982), firmly established the constitutional right to participate in political boycotts. In that case, the Supreme Court considered an NAACP-organized boycott of white-owned businesses. In addition to the refusal to deal at the core of any boycott, the *Claiborne* boycott included speeches, public meetings, and nonviolent picketing, *id.* at 915, as well as individual instances of violence and threats of violence. *Id*. at 920–21, 933.

At the trial level, the Mississippi state court held that the entire boycott was unlawful under the common law tort of malicious interference with business relations, the state law prohibiting secondary boycotts, and the state antitrust statute. *Id.* at 891–92 & nn. 6–10. On appeal, the Mississippi Supreme Court dispensed with the latter two theories on statutory grounds, but nevertheless "concluded that the entire boycott was unlawful" under the common law tort theory because the boycott had been effectuated through violence and threats. *Id.* at 894–

95. It accordingly imposed liability on the boycott participants "for all damages 'resulting from the boycott.'" *Id.* at 921.[2]

The Supreme Court reversed, ruling that "[t]he right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott." *Id.* at 914. Fundamentally, the Court held that "the nonviolent elements of petitioners' activities"—including the concerted refusal to deal at the heart of the boycott, as well as the speeches, nonviolent picketing, and public meetings supporting the boycott—"are entitled to the protection of the First Amendment." *Id.* at 915.

The Court explained: "The Mississippi Supreme Court did not sustain the chancellor's imposition of liability on a theory that state law prohibited a nonviolent, politically motivated boycott. The fact that *such activity* is constitutionally protected, however, imposes a special obligation on this Court to examine critically the basis on which liability was imposed." *Id.* (emphasis added). The "activity" that the Supreme Court held to be "constitutionally protected" must be "a nonviolent, politically motivated boycott." The Court also held that a "careful limitation on damages liability" had to be imposed to accommodate "the important First Amendment interests at issue in this case," namely that "[p]etitioners *withheld their patronage* from the white establishment of Claiborne County to challenge a political and economic system that had denied them the basic rights of dignity and equality . . . While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of *nonviolent, protected activity*." *Id.* at 918 (emphases added). Here, too, the Court could only be referring to the act of withholding patronage when it described "nonviolent, *protected* activity" (emphasis added).

---

[2] Mississippi's anti-boycott statute was eventually declared unconstitutional pursuant to a settlement agreement. *Echols v. Parker*, 909 F.2d 795, 797 (5th Cir. 1990).

In both of these passages, the Court made clear that all the nonviolent aspects of the boycott, including the withholding of patronage, enjoyed protection under the First Amendment. Liability could be imposed only for those business losses caused by threats or acts of violence—the aspects of the boycott that did not enjoy constitutional protection.

The idea that participating in a boycott, including engaging in refusals to deal, is protected by the First Amendment is essential to *Claiborne*. The Court noted that the outcome before the trial court reflected the "view that voluntary participation in the boycott was a sufficient basis on which to impose liability." *Id.* at 921. The Supreme Court rejected that theory. And, although the Mississippi Supreme Court also "properly rejected that theory[,] it nevertheless held that petitioners were liable for all damages 'resulting from the boycott.'" *Id.* This was the Mississippi Supreme Court's fundamental error: it effectively imposed liability for participating in a constitutionally protected boycott.

"In light of the principles set forth" in its opinion, the Supreme Court found it "evident that such a damages award may not be sustained in this case." *Id.*; *see also id.* at 926 ("For the reasons set forth above, liability may not be imposed on Evers for his presence at NAACP meetings *or his active participation in the boycott itself*." (emphasis added)). If, as Paxton maintains, the First Amendment does not protect nonviolent participation in a political boycott, there would have been no First Amendment basis for limiting the damages award the state court had imposed on nonviolent boycott participants like Charles Evers. The Court was willing to entertain individual liability "for the consequences of [individuals'] violent deeds," but rejected "imposition of all damages 'resulting from the boycott.'" *Id.* at 921, 933.

Had the Court wanted to hold that only speech, association, and petitioning in support of the boycott were protected, it could easily have done so. Instead, it held that all of the peaceful

activities undertaken in support of the boycott—including the collective refusal to deal—were protected.

The obvious import of *Claiborne*'s holding is further reflected in the Supreme Court's subsequent decisions in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988), and *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990), both of which concerned concerted refusals to deal that were at least partially motivated by economic self-interest. In both cases, the Court recognized that *Claiborne* established a First Amendment right to nonviolent participation in politically-motivated boycotts (as opposed to the economically-motivated boycotts at issue in those cases). *See Allied Tube*, 486 U.S. at 508 ("In [*Claiborne Hardware*] we held that the First Amendment protected the nonviolent elements of a boycott of white merchants organized by the [NAACP] and designed to make white government and business leaders comply with a list of demands for equality and racial justice. . . . Here, in contrast, petitioner was at least partially motivated by the desire to lessen competition . . . ."); *Superior Court Trial Lawyers Ass'n*, 493 U.S. at 426 ("The activity that the FTC order prohibits is a concerted refusal by CJA lawyers to accept any further assignments until they receive an increase in their compensation; the undenied objective of their boycott was an economic advantage for those who agreed to participate. It is true that the *Claiborne Hardware* case also involved a boycott. That boycott, however, differs in a decisive respect. Those who joined the *Claiborne Hardware* boycott sought no special advantage for themselves."). The Supreme Court's distinction between political and economic boycotts in these cases would have been entirely unnecessary if *Claiborne* protected only speech supporting boycotts.

### B.    *Longshoremen* **and** *Rumsfeld* **Are Inapposite.**

The fact that *Claiborne* established constitutional protection for politically-motivated consumer boycotts is further borne out by the Supreme Court's efforts to specify the particular circumstances under which a state may constitutionally regulate a boycott. The Court stated: "Unfair trade practices may be restricted. Secondary boycotts and picketing by labor unions may be prohibited as part of Congress' striking the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife." *Claiborne*, 458 U.S. at 912 (internal quotation marks omitted) (citing, *inter alia*, *Int'l Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*, 456 U.S. 212, 222-23 (1982)). Even as the Court recognized the States' "broad power" to regulate such "economic activity," it refused to "find a comparable right to prohibit peaceful political activity such as that found" in the *Claiborne* boycott. *Id.* at 913.[3]

Paxton contends that the boycotts prohibited by the Act fall under *Longshoremen*, but, under this reading, the exception would swallow the rule. *Longshoremen*—which was decided before *Claiborne*—describes a secondary labor boycott exception to the general rule that political boycotts are protected under the First Amendment. As the Arizona District Court explained in preliminarily enjoining a law very similar to the Act, "Defendants overstate the meaning of *Int'l Longshoremen*, which was decided in the context of federal labor laws . . . [and]

---

[3] Paxton argues that *Claiborne* broadly affirmed the rights of states to regulate nonviolent and voluntary boycotts that have a disruptive effect on economic conditions. To the contrary, *Claiborne* acknowledged that boycotts "may have" such a disruptive economic effect, and carefully delineated the specific circumstances under which such boycotts may be restricted pursuant to the states' power to regulate economic activity. 458 U.S. at 912. The boycotts regulated by the Act do not fall under any of those exceptions. Moreover, Paxton has not submitted any evidence to demonstrate that the boycotts regulated by the Act have actually had a disruptive effect on Texas's economy.

does not purport to state that there is no constitutional right to engage in boycotting activities." *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, 1041 (D. Ariz. 2018).

Plaintiffs, and more broadly participants in BDS campaigns, are differently situated from the plaintiffs in *Longshoremen*—they are not members of a union and they are not refusing to service cargo ships; rather, they are individuals and organizations refusing to purchase consumer goods and services. Thus, the boycott campaigns targeted by the Act much more closely resemble the consumer boycott at issue in *Claiborne*, which "directly intended . . . that the [boycotted] merchants would sustain economic injury as a result of their campaign" to withhold patronage, as part of an effort "not to destroy legitimate competition" but to "vindicate rights of equality and of freedom." 458 U.S. at 914.

Alternatively, Paxton attempts to avoid *Claiborne*'s application to this case by relying on *Rumsfeld v. FAIR*, 547 U.S. 47 (2006). Although Defendants attempt to characterize *Rumsfeld* as a case about boycotts, neither the word "boycott" nor any citation to *Claiborne* appears in the Court's decision. The case cannot be read to overrule *Claiborne sub silentio*. Moreover, *Rumsfeld*'s silence with regard to *Claiborne* should not be surprising because the cases are distinguishable in a number of material respects.

First, unlike the boycott in *Claiborne* and the boycotts regulated by the Act in this case, *Rumsfeld* did not concern a boycott of consumer goods and services. Rather, the Court made clear that the law at issue mandated only a particular action—allowing military recruiters on campus—which is not expressive.

In contrast, as the Kansas District Court held when preliminarily enjoining a law much like the Act, "boycotts—like parades—have an expressive quality." *Koontz v. Watson*, 283 F. Supp. 3d 1007, 1024 (D. Kan. 2018). And "[b]ecause [the act] regulates inherently expressive

conduct and forces plaintiff to accommodate [the state's] message, it is unlike the law . . . in *Rumsfeld.*" *Id*. The Arizona District Court agreed. *See Jordahl*, 336 F. Supp. 3d at 1042. The District Court for the Eastern District of Arkansas is the only court to hold that *Rumsfeld* controls because "the decision to engage in a primary or secondary boycott of Israel is 'expressive only if it is accompanied by explanatory speech.'" *Arkansas Times LP v. Waldrip*, No. 4:18-CV-00914 BSM, 2019 WL 580669, at *5 (E.D. Ark. Jan. 23, 2019). This reading ignores the history and tradition of boycotts in the United States. *See* Glickman Br. Unlike a school's refusal to allow a recruiter on campus, an individual's decision to join in a political consumer boycott, much like the decision to march in a parade, constitutes a recognizable, expressive activity. "[T]he practice of persons sharing common views banding together to achieve a common end" in this way "is deeply embedded in the American political process." *Claiborne*, 458 U.S. at 907 (quoting *Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 294 (1981)).

Second, the Solomon Amendment at issue in *Rumsfeld* did not "restrict[] what the law schools may say about the military's policies" or the ability of "[s]tudents and faculty . . to associate to voice their disapproval of the military's message" 547 U.S. 47, 65, 69-70 (2006). In other words, it did not require law schools or anyone associated with them to disavow participation in boycotts of the military. *Id.* at 60. In essence, the Court read the law so narrowly that it ensured that the case was about unexpressive conduct, not boycotts, and the word boycott does not even appear in the decision.

The same is not possible here. In sharp contrast to the Solomon Amendment, the Act requires contractors to affirmatively certify that they are not participating in boycotts of Israel, full stop, and this severely hampers their ability to speak out about Israel or BDS campaigns. At

the very least, contractors who sign a form promising not to boycott will be chilled from engaging in such speech, which further supports the conclusion that the Act is facially unconstitutional because it restricts and chills protected expression and association. *See Baggett v. Bullitt*, 377 U.S. 360, 367–68 (1964); *Moonin v. Tice*, 868 F.3d 853, 861 n.5 (9th Cir. 2017).

Finally, the government interests at issue in *Rumsfeld* are not present here. The Supreme Court held that the Solomon Amendment is a speech-neutral regulation that promotes the government's substantial "interest in raising and supporting the Armed Forces" *Rumsfeld*, 547 U.S. at 67. The Court observed that "judicial deference is at its apogee when Congress legislates under its authority to raise and support armies." *Id.* at 58 (internal quotation marks and alterations omitted). No such interest exists here. And, whereas in *Rumsfeld*, Congress' interest in raising and maintaining the Armed Forces was not related to the suppression of expression, *id.* at 58, the State's only plausible interest in prohibiting boycotts of Israel is to suppress disfavored expression. Thus, *Claiborne*, not *Rumsfeld*, controls here.

### C.     The First Amendment's protection is not limited only to speech that bears on domestic legal interests.

Paxton argues that "[e]ven if *Claiborne* stands for the proposition that the act of refusing to deal enjoys First Amendment protection, such a right is limited in scope . . . to nonviolent, primary political boycotts to vindicate particular statutory or constitutional interests." Mot. to Dismiss at 12 (quoting *Arkansas Times LP v. Waldrip*, No. 4:18-CV-00914 BSM, 2019 WL 580669, at *6 (E.D. Ark. Jan. 23, 2019)). As noted previously, *Claiborne* itself considered a secondary, not primary, boycott and held that it was protected by the First Amendment.

Paxton's focus on "statutory or constitutional interests" imposes a similarly inaccurate limitation on *Claiborne*, which considered a boycott directed at "both civic and business

leaders," 458 U.S. at 907, that "sought to bring about political, social, and economic change," *id.*
at 911. Paxton's reading would so narrow *Claiborne* that it could make the protection for
boycotts practically irrelevant. Such a reading would not only leave political boycotts of foreign
countries unprotected—including the Quaker-led boycott of slave-labor goods, the Anti-Nazi
Boycott of 1933, the silk boycott of China and Japan during World War II, and the boycott of
apartheid South Africa—but it would also remove protection from political consumer boycotts
aimed at changing corporate practices, including recent boycotts of BP, Walmart, Uber, Nike,
and Gillette.

      *Claiborne*'s reach is not so limited. To the contrary, *Claiborne* held that the NAACP-
organized boycott was protected as a form of "expression on public issues," just like the boycotts
here. 458 U.S. at 913-15. In the words of the Kansas District Court, "[t]he conduct prohibited by
the [Act] is protected for the same reason as the boycotters' conduct in *Claiborne* was protected.
[Plaintiffs] and others have 'banded together' to express, collectively, their dissatisfaction with
Israel and to influence governmental action. Namely, its organizers have banded together to
express collectively their dissatisfaction with the injustice and violence they perceive, as
experienced both by Palestinians and Israeli citizens." *Koontz v. Watson*, 283 F. Supp. 3d 1007,
1022 (D. Kan. 2018).

      There is no basis for limiting the First Amendment's reach to expression concerning
domestic legal issues, nor has the Supreme Court interpreted the First Amendment as doing so.
*Boos v. Barry*, 485 U.S. 312, 318-19 (1988) (law that prohibited displaying signs critical of
foreign governments within 500 feet of an embassy violated the First Amendment). Such a
limitation would ignore the Supreme Court's express instruction that "constitutional protection
does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are

11

offered.'" *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964).

Thus, Plaintiffs have sufficiently alleged that the Act violates the First Amendment because it forces state contractors to sacrifice their First Amendment right to engage in political boycotts of Israel.

### D.   The Act discriminates on the basis of content and viewpoint.

Paxton also argues that the Act is viewpoint neutral because it is a valid anti-discrimination law. Paxton relies on *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, which considered a law requiring businesses to provide all persons "full and equal accommodations" regardless of "sex, race, color, religion, ancestry, or national origin." 481 U.S. 537, 541 n. 2 (1987). The Supreme Court correctly held that "[o]n its face the . . . Act . . . makes no distinctions on the basis of the organization's viewpoint." *Id.* at 549. Most anti-discrimination statutes regulate unexpressive conduct by prohibiting discrimination based on protected characteristics in employment, housing, and places of public accommodation. Such anti-discrimination statutes do not present a First Amendment problem. *See id.* at 548–49; *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984).

On the other hand, the Act targets inherently expressive conduct (political boycotts). Even facially neutral anti-discrimination statues may amount to content or viewpoint discrimination when improperly applied to protected expression, such as a parade or a boycott. *See Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 572–73 (1995) (holding that application of Massachusetts's facially content-neutral public accommodations statute to require a parade to admit an LGBT group "violate[d] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message."). In this case, however, the Act is itself facially content- and

viewpoint-discriminatory. It prohibits political boycotts only when they target Israel, territories controlled by Israel, or companies that do business in Israel or Israeli-controlled territories. The Act does not prohibit boycotts of any other country or place, nor does it prohibit discrimination based on any protected characteristic.

In addition to imposing a subject-matter based restriction on participation in political boycotts, the Act's myopic focus on boycotts of Israel undermines the State's asserted interest in preventing nationality discrimination. "Such '[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (quoting *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011)). And the existence of content-neutral alternatives—such as a statute more akin to the one at issue in *Rotary*, prohibiting contractors from engaging in discrimination based on nationality, national origin, or religion generally—"undercut[s] significantly any defense of such a statute, casting considerable doubt on the government's protestations that the asserted justification is in fact an accurate description of the purpose and effect of the law." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (alteration in original) (citations omitted). The only interest actually served by the Act "is that of displaying the [State's] special hostility towards the particular biases thus singled out. That is precisely what the First Amendment forbids." *Id.* at 396. Thus, Plaintiffs have sufficiently alleged a second basis for their First Amendment claim.

### E.   The Act compels speech.

Paxton argues that, because the First Amendment does not protect boycotts, the certification does not compel speech. As previously discussed, this misunderstands *Claiborne*.

13

"[W]hatever justification may be offered, a State may not inquire about a man's views or associations solely for the purpose of withholding a right or benefit because of what he believes." *Baird v. State Bar of Arizona,* 401 U.S. 1, 7 (1971); *see also Cole v. Richardson*, 405 U.S. 676, 680 (1972)). The Act compels contractors to reveal whether they engage in protected activity, boycotting Israel, in order to punish those who do.

Even if the First Amendment did not protect boycotts, the Act would still not pass constitutional muster because the State has failed to articulate any legitimate government interest for the certification requirement. The State has no legitimate interest in compelling speech on this subject because Plaintiffs' participation or lack thereof in boycotts of Israel is not related to their ability to perform contracting work for the State. Paxton does not contend otherwise. The only plausible state interests are to compel accommodation of the state's message in support of Israel and to punish disfavored beliefs—both impermissible government goals. *See Koontz*, 283 F. Supp. 3d at 1022; *see also Nat'l Ass'n of Mfrs. v. S.E.C.*, 748 F.3d 359, 371 (D.C. Cir. 2014) (holding that compelled disclosure regarding whether certain products and minerals were conflict-free constituted compelled speech in violation of the First Amendment because the regulation did not narrowly or reasonably "fit" the asserted government interest); *see also Robinson v. Reed*, 566 F.2d 911, 913 (5th Cir. 1978) (per curiam) (observing that compelled disclosures about a plaintiff's personal life that were unrelated to her employment would not withstand constitutional scrutiny). Thus, Plaintiffs have sufficiently alleged a compelled speech basis for their First Amendment claim.

## II.     Plaintiffs have sufficiently pled that the Act is impermissibly vague.

Paxton argues that the Act is not impermissibly vague because it prohibits purely economic conduct. But he does not deny that a person of ordinary intelligence could not discern

14

the meaning of "any action that is intended to penalize [or] inflict economic harm on, or limit commercial relations specifically with Israel or [any] person or entity doing business in Israel." Tex. Gov. Code at §808.001(1). Paxton asserts that the phrase "any action" refers only to economic conduct. But a contractor reading the statute's expansive catchall definition after signing the certification would likely assume that the Act prohibits activities like picketing to encourage other consumers to refuse to purchase products offered by companies that contract with the Israeli government or operate in Israeli settlements, since such picketing is designed to "penalize" those companies and "limit commercial relations" with them.

Paxton's narrow construction of the statute in litigation is therefore cold comfort to contractors reasonably chilled by the certification requirement and the Act's facially vague definition of boycott activity. *See Baggett v. Bullitt*, 377 U.S. 360, 368 (1964) (holding that a loyalty oath requiring state employees to disavow subversive acts and membership in the Communist Party and other subversive groups was "unconstitutionally vague" because of "[t]he susceptibility of the statutory language to require forswearing of an undefined variety of 'guiltless knowing behavior'"). "Those with a conscientious regard for what they solemnly swear or affirm, sensitive to the perils posed by the oath's indefinite language, avoid the risk of loss of employment, and perhaps profession, only by restricting their conduct to that which is unquestionably safe. Free speech may not be so inhibited." *Id*. at 372.

Even accepting Paxton's construction does not clarify the law. A person of reasonable intelligence could not discern what sorts of acts—even economic acts—would be considered "intended to penalize [or] inflict economic harm on Israel." For instance, donating to an organization that promotes BDS could be considered an action intended to "penalize" Israel. *See* Mot. for Prelim. Inj. (Dkt. 14-1 (No. 1:18-CV-01100-RP) at 36-37.  And the vagueness problem

15

is only compounded by the Act's nebulous exception for "ordinary business purposes." This leaves a person of reasonable intelligence with even less clarity about what conduct is prohibited under the Act. Thus, Plaintiffs have sufficiently alleged that the Act is impermissibly vague.

### Conclusion

For all these reasons, this Court should deny Paxton's motion to dismiss.

Respectfully submitted,

*/s/ Edgar Saldivar*
Edgar Saldivar, TX Bar No. 24038188
Thomas Buser-Clancy, TX Bar No. 24078344
Andre Segura, TX Bar No. 24107112**
Adriana Piñon, TX Bar No. 24089768
ACLU Foundation of Texas, Inc.
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 325-7011
Fax: (713) 942-8966
esaldivar@aclutx.org
tbuser-clancy@aclutx.org
asegura@aclutx.org
apinon@aclutx.org

Brian Hauss**
Vera Eidelman**
American Civil Liberties Union Foundation
Speech, Privacy & Technology Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Fax: (212) 549-2654
bhauss@aclu.org
veidelman@aclu.org

Kevin Dubose*
Alexander, Dubose, Jefferson & Townsend
1844 Harvard Street
Houston, TX 77008
Telephone: (713) 522-2358
Fax: (713) 522-4553
kdubose@adjtlaw.com

ATTORNEYS FOR PLAINTIFFS

\* Applications for admission are forthcoming/pending
\*\*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on March 5, 2019, this document will be filed via the Court's ECF system, which will serve electronic notice on all counsel of record.


/s/ *Edgar Saldivar*
Edgar Saldivar